Ronald ALLISON/Fire Insurance Exchange, Appellants,

v.

FIRE INSURANCE EXCHANGE, a Member of the Farmers Insurance Group/Mary Melinda Ballard and Ronald Allison, Individually and as Next Friends for Reese Allison, a Minor, Appellees.

No. 03-01-00717-CV.

Court of Appeals of Texas, Austin.

Dec. 19, 2002.

Rehearing Overruled Feb. 13 and 21, 2003.

---

1972).

Kendall C. Montgomery, Kendall Montgomery, P.C., Houston, J. Woodfin Jones,

Scott, Douglass & McConnico, LLP, Austin, William Fred Hagans, Paula Janecek, Hagans, Bobb & Burdine, Houston, Terry Scarborough, Hance, Scarborough, Wright, Ginsberg & Brusilow, L.L.P., Austin, Vincent Lee Marable III, Paul Webb, P.C., Wharton, for appellant-R.A.

Todd A. Hunter, Hunter & Handel, P.C., Corpus Christi, Stephen G. Tipps, Tynan Buthod, Baker & Botts, L.L.P., Houston, Joseph R. Knight, Susan Dillon Ayers, Bob E. Shannon, Baker & Botts, L.L.P., Austin, Robert F. Scheihing, Adami, Goldman & Shuffield, Inc., San Antonio, for Fire E.

Before Chief Justice ABOUSSIE, Justices PATTERSON and PURYEAR.

JAN P. PATTERSON, Justice.

In June 2001, a Travis County jury awarded a verdict for over thirty-two million dollars against Fire Insurance Exchange, a member of the Farmers Insurance Group ("FIE"), for its handling of Mary Melinda Ballard's [1] homeowner's insurance claims, which began as a single claim for water damage to a hardwood floor and evolved to include mold contamination of the entire house and outbuildings. FIE contends in eleven issues on appeal that the evidence was legally and factually insufficient to support the jury's liability findings; the district court erred in denying transfer of venue to Hays County; the evidence was legally and factually insufficient to support the jury's findings that FIE failed to appoint a competent, independent appraiser and that the appraisal decision was rendered as a result of fraud, accident, or mistake; the district court abused its discretion in numerous evidentiary rulings; there was no evidence

of a knowing violation; the punitive damages award is excessive; there was no evidence to support the mental anguish award; there was insufficient evidence to support the attorneys' fees award; and there was no basis for the statutory penalty under article 21.55 of the insurance code. *See* Tex. Ins.Code Ann. art. 21.55, § 6 (West Supp.2003).

We recognize the constraints on this Court in its review of this hotly disputed case and the importance of according the proper degree of deference to the fact finder. We have carefully reviewed the entire record. We hew to the record below despite the metamorphosis of the parties' theories on appeal. We hold that probative evidence supports the district court's denial of FIE's motion to transfer venue to Hays County. We further conclude that the district court did not abuse its discretion in the evidentiary rulings of which FIE complains. We also find sufficient evidence to uphold the jury's findings that FIE breached its duty of good faith and fair dealing toward Ballard and that FIE committed a Deceptive Trade Practices Act (DTPA) violation. We find insufficient evidence, however, to support the jury's findings of unconscionability or fraud. We additionally find insufficient evidence to support the jury's findings that FIE failed to appoint a competent, independent appraiser or that the appraisal decision was a result of fraud, accident, or mistake. Because the court's charge specified that findings of either a breach of the duty of good faith and fair dealing or a DTPA violation are sufficient to uphold the jury's award of actual damages, we affirm the actual damages award in part, in the amount of $4,006,320.72, in addition to pre-

---

1. The parties to this appeal are Mary Melinda Ballard and her husband, Ronald Allison, the plaintiffs in the case below, and Fire Insurance Exchange, the defendant in the case below. Ballard owns title to the house, and thus the homeowner's insurance is in her name.

judgment and postjudgment interest as stated in the final judgment. We reverse the award of $176,000 for Ballard's reasonable and necessary costs of the appraisal process.

We further conclude that there is no evidence to support the jury's finding that FIE "knowingly" breached its duty of good faith and fair dealing toward Ballard. Because a finding of a knowing violation is required to uphold punitive and mental anguish damages, we reverse the jury's awards for these damages and render judgment that Ballard take nothing for punitive and mental anguish damages. We uphold the district court's award of the article 21.55 statutory penalty in part and remand the penalty for recalculation in accordance with this opinion. We find sufficient evidence to support the award of attorneys' fees but cannot say that the amount of the award is reasonable, given our significant reduction of the jury's damages awards. Therefore, we remand the issue of attorneys' fees to the district court for further proceedings consistent with this opinion.

Ronald Allison, Ballard's husband, filed a separate appeal, contending that the district court erred in granting FIE's motion to exclude Allison's causation experts and in turn granting FIE's no-evidence motion for partial summary judgment pertaining to Allison's personal injury claims. Because we find no error in the district court's rulings, we affirm the district court's rulings in granting FIE's motion to exclude his causation experts and no-evidence motion for partial summary judgment pertaining to Allison's personal injury claims. Accordingly, we affirm the district court's judgment dismissing Allison's personal injury claims.

## BACKGROUND

In 1990, Ballard bought a large house in Dripping Springs, Texas, for $275,000 in a foreclosure sale. The main house was approximately 7,400 square feet, with several outbuildings, including a nanny's apartment (also referred to as the groundskeeper's house), a garage, and a barn. In late 1992, Ballard began insuring the house with FIE. The amount of coverage remained steady over the next few years, except for cost-of-living adjustments. The coverage in late 1998 was $313,000 for the house and $187,800 for the contents.

Within a couple of years before the claims at issue, which began in December 1998, the Ballard house had a few plumbing leaks. In 1996 and 1997, Ballard filed two claims for plumbing leaks caused by frozen pipes; FIE paid $60,000 to $70,000 for the 1997 claim. She did not make another claim until December 1998 but continued to have plumbing leaks. In late 1997, Ballard had a toilet leak repaired in the downstairs half bathroom, which required another repair in January 1998. The leak caused damage to the bathroom carpet pad and wood subflooring, both of which were replaced in February 1998. The same month, Ballard notified Richard Roberts of Double R Floors that some of the boards in the downstairs hardwood floor were warping. Roberts took a moisture reading in the area of warping, which read nineteen to twenty percent. The normal moisture content of hardwood floors is around twelve percent. He then replaced some of the boards.

The plumber returned a third time to repair the half bath toilet leak in July 1998. In August 1998, Ballard notified Roberts of more hardwood floor warping and buckling. He took another moisture measurement, which was seventeen to eighteen percent, then replaced more boards. In October 1998, Ballard called Roberts again to report more hardwood floor damage. The moisture measurement

was fifteen to sixteen percent, and Roberts replaced more boards. Roberts examined the floor again in December 1998 and took a moisture reading of fourteen to fifteen percent. At that time, Roberts said that the damage was too extensive to do any more spot repairs. He recommended that Ballard file a claim under her homeowner's insurance policy.

On December 17, 1998, Ballard filed a claim with FIE for the water damage to the hardwood floor. An outside adjuster inspected the floor on December 22 and at first opined that the damage was caused by foundation settling, which is not covered under the homeowner's policy. After seeing two areas of water damage, he reconsidered and requested plumbing tests. The claim was assigned to Theresa McConnell, an adjuster in FIE's Austin foundation claims office, who received the file on December 30, 1998. McConnell's original estimate of the claim was around $100,000, and her level of authority was $20,000.

On the same day, the Gerloff Company, a plumbing contractor, performed tests at FIE's request and found no leaks. McConnell contacted Jeff Jackson, a civil engineer, to determine the amount and cause of damage to the hardwood floor. In the meantime, Ballard obtained bids to replace the hardwood floor, ranging from approximately $89,000 to $171,000. The $89,000 bid, from Boatright Floors, increased to $127,950 after Ballard requested that the floor be custom made, not manufactured, as was the original floor.

McConnell and Jackson went to the Ballard home on January 7, 1999, so that Jackson could inspect the damage. Jackson found two sources of moisture, one in the half bathroom and one around the refrigerator. On January 11, McConnell sent a letter to Ballard stating that "complete plumbing tests of your residence were conducted by Gerloff Co., Inc. No leaks were located in the plumbing system of your residence." On January 12, Jackson requested additional testing of the moisture sources. The additional test showed that the moisture level of the floor was twelve percent. Ballard sent a letter to McConnell expressing concern that the buckled floors presented a tripping hazard; McConnell suggested temporary repairs while the claim was being investigated, including covering the areas with carpet or replacing the buckled pieces with plywood. Ballard agreed to carpeting the entire floor or replacing the boards in "trouble" areas, but the temporary repairs were never made.

McConnell requested an appraisal of the house by an independent appraiser because she was concerned that the house was underinsured. The appraiser valued the house at approximately $749,000. McConnell notified Ballard of the appraisal, and Ballard requested increased coverage if her current coverage was not adequate. In early March, FIE increased the coverage to $750,000 for the house and $450,000 for the contents.

In the meantime, on February 8, McConnell sent a letter to Ballard stating that FIE needed a forty-five-day extension to complete the claim investigation. At approximately this same time, Ballard hired an attorney to represent her. On February 24, FIE paid Ballard $108,316.50 for accidental water discharge damage to the floor, based on the $127,950 Boatright estimate, less depreciation and the deductible. FIE imposed an underinsurance penalty, paying the depreciated value instead of replacement cost, because the house, recently reappraised, was insured for only $313,000 at the time of the December 1998 claim.

On March 4, McConnell and contractors went to the Ballard home to inspect newly

discovered damage, which was assigned a new claim number. Ballard's lawyer was present for this meeting and notified FIE in writing on March 11 that he was representing Ballard and that all contact concerning the claims should be with him instead of Ballard. At Ballard's request, FIE sent a technician to determine if her refrigerator was still leaking; the report showed additional damage behind the refrigerator.

In early April, Ballard met Bill Holder, an indoor air quality consultant, on a plane flight. Upon hearing about the damage to Ballard's house and physical symptoms that her family was having, Holder suggested that she might have a mold problem. Holder came to the Ballard house on April 5 at Ballard's insistence to take some air samples. The samples contained mold spores, including a type of mold called *stachybotrys*, which produces toxins that may cause health problems. On April 7, Ballard's lawyer sent a letter notifying FIE of the mold findings. Ballard, concerned about possible health effects of the mold, moved with her husband, Ron, and three-year-old son to the nanny's apartment. FIE's attorney suggested on April 8 that the parties mediate their dispute. Meanwhile, Holder met with Ballard, McConnell, and Steve Shelburne, McConnell's supervisor, on April 13 to discuss the mold findings. At the meeting, Holder explained the possible health effects of mold and that mold grows "exponentially."

FIE sent engineers from Rimkus Consulting to take air samples on April 14. Holder and others returned to the house to conduct tests on April 21. On April 23, Holder told Ballard that, based on the new test results, she and her family immediately needed to move out of the house. Ballard's family took Holder's advice and left the house that day, leaving behind their belongings. They and their nanny moved

into the Four Seasons Hotel in Austin, which FIE agreed to pay for until a more permanent location was found. Ballard and her family moved out of the Four Seasons and into a rental home around June 1.

Around the same time, FIE paid about $8,000 for a shower leak claim in late April, about $25,000 for damage related to an ice-maker leak claim in late April, and about $45,900 for supplemental damage to walls and sheet rock in early May. On May 5, Ballard filed suit in Travis County against FIE for breach of contract, deceptive trade practices, breach of the duty of good faith and fair dealing in the claims handling process, and negligence.

In preparation for mediation, also in May, Rimkus prepared an estimate to remediate and repair the house and the contents, which totaled $382,000. Ballard's expert estimated that remediation would cost approximately $1,015,500. The parties proceeded to mediation for three days in late May, which ended unsuccessfully on May 27. That same day, FIE invoked the appraisal provision of the insurance policy, available if the parties do not agree on valuation of a claim. Under the appraisal provision, both parties were to choose independent appraisers to evaluate the claims.

FIE notified Ballard in its May 27 letter that it had designated Peter de la Mora, a structural engineer with extensive experience in the construction industry, as its appraiser. Ballard chose as her appraiser an attorney, who had to resign a few months later because of trial obligations. Both parties agreed that Michael Schless, a former county-court-at-law judge, would be the "umpire," as termed in the policy, to whom the appraisers would submit their differences if they failed to agree on the amount of loss. Ballard then chose anoth-

er attorney, Mike Duffy, as her successor appraiser in November 1999.

From May through July 1999, Ballard submitted additional claims for leaks in the roof, two leaks in the water tank room, water damage in the garage and barn, water damage under the kitchen sink, leaks in the nanny's apartment, loose tiles on the porch, and a fountain leak. In June, Sandra Clanton replaced Theresa McConnell as the adjuster. On August 30, FIE paid approximately $382,000 for mold remediation and repair of the house and contents. Ballard's attorney returned the checks on the ground that the payments were based on "invalid" bids. In February 2000, FIE again tendered checks for approximately $382,000, which Ballard's attorney deposited into the registry of the court.

The appraisal process continued for several months, then the appraisers met for four days in November 2000 to determine the amount of loss. The appraisal decision, issued on November 16, 2000, awarded $1,287,092.72, deducting amounts that FIE had previously paid, for the house, its contents, and additional living expenses. Although both appraisers and the umpire signed the decision, only FIE's appraiser and the umpire agreed to the amount of the award. On November 18, FIE sent checks for the amount of the appraisal decision to Ballard's attorney, who again deposited the checks into the registry of the court.

Meanwhile, the lawsuit proceeded, with the parties conducting discovery and various hearings. FIE filed a motion to transfer venue to Hays County, where the house was located, on the ground that venue was mandatory in Hays County because this was a property damage claim. The district court denied the motion to transfer venue in November 1999. FIE later sought to exclude Ronald Allison's

personal injury claims on the ground that the toxic effects of mold were not sufficiently established in the scientific community. Just before trial, the district court excluded Allison's claims on the basis that his expert witnesses did not have reliable epidemiological studies about the health effects of exposure to mold.

The case proceeded to trial on May 7, 2001. The jury began deliberations on May 30, 2001 and returned a verdict in favor of Ballard the next day. The jury awarded $2,547,350 to replace the home; $1,154,175 to remediate the home; $2,000,000 to replace the contents of the home; $350,000 for past and future additional living expenses; $176,000 for Ballard's costs of the appraisal process; $5,000,000 for Ballard's mental anguish; $12,000,000 in punitive damages; and $8,891,000 for attorneys' fees. The district court rendered a final judgment on October 30, 2001, for over $33 million, reducing actual damages by $2,045,204.28 (the total amount that FIE had already paid to Ballard on her claims) and including prejudgment interest and a statutory penalty under article 21.55 of the insurance code on portions of the award.

FIE filed motions for new trial, for remittitur, and to modify the judgment. The district court denied the motion for remittitur. The motions for new trial and to modify the judgment were overruled by operation of law. Allison appeals the district court's rulings concerning the exclusion of his causation expert witnesses. FIE appeals all of the jury's findings and several district court rulings.

## ALLISON'S APPEAL

In two issues, Allison urges that the district court erred in granting FIE's *Daubert / Robinson* motion to exclude causation opinions of expert witnesses and as a result granting FIE's no-evidence mo-

tion for partial summary judgment as to Allison's personal injury claims. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995).

### FIE's Motion to Exclude Causation Opinions

In his first issue, Allison contends that the district court erred in granting FIE's motion to exclude causation opinions of expert witnesses. In *Robinson,* the Texas Supreme Court held that rule of evidence 702 requires proponents of scientific expert testimony to satisfy the test for admissibility formulated by the United States Supreme Court in *Daubert.* Tex.R. Evid. 702; *Robinson,* 923 S.W.2d at 556. A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified, and (2) the testimony must be relevant and based on a reliable foundation. *Robinson,* 923 S.W.2d at 556. According to this test, the trial judge must act as a "gatekeeper" and decide whether a qualified expert's testimony is relevant and reliable. *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786; *Robinson,* 923 S.W.2d at 556–57. We review the district court's ruling under an abuse of discretion standard. *Robinson,* 923 S.W.2d at 558; *Olin Corp. v. Smith,* 990 S.W.2d 789, 797 (Tex.App.-Austin 1999, pet. denied).

"The court in discharging its duty as gatekeeper must determine how the reliability of particular testimony is to be assessed." *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex. 1998). In *Robinson,* the Texas Supreme Court recognized several nonexclusive factors enumerated by the court in *Daubert* to guide trial courts in acting as gatekeepers to assess the reliability of scientific expert testimony:

- the extent to which the theory has been or can be tested;
- the extent to which the technique relies upon the subjective interpretation of the expert;
- whether the theory has been subjected to peer review and/or publication;
- the technique's potential rate of error;
- whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and
- the non-judicial uses which have been made of the theory or technique.

*Robinson,* 923 S.W.2d at 557 (citations omitted). A trial court must "focus solely on the validity of principles and methodology underlying the testimony, not the conclusions generated." *North Dallas Diagnostic Ctr. v. Dewberry,* 900 S.W.2d 90, 95 (Tex.App.-Dallas 1995, writ denied). If an expert relies on unreliable foundational data, any opinion drawn from that data is likewise unreliable. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997).

We now determine whether the district court abused its discretion in excluding the testimony of Allison's causation expert witnesses. A reviewing court cannot conclude that a trial court abused its discretion merely because, in the same circumstances, it would have ruled differently or the trial court committed a mere error in judgment. *Robinson,* 923 S.W.2d at 558. The test is not whether the facts present an appropriate case for the trial court's action in the opinion of the reviewing court. *Id.* Rather, we will gauge an abuse of discretion by whether the trial court acted without reference to any guiding rules or principles. *Id.* Thus, a trial court enjoys wide latitude in determining whether expert testimony is admissible. *See Olin,* 990 S.W.2d at 795.

*Stachybotrys* was discovered in the Ballard home in early April 1999. The family

moved from the main house to the nanny's apartment, then moved into a hotel on April 23, 1999, after mold was also discovered in the apartment. Allison began having increasing problems with concentration and memory in April through July 1999. After seeing several doctors in Austin, Allison was diagnosed with a type of brain damage called toxic encephalopathy. Several medical professionals, including two leading experts in the study of the health effects of molds and mycotoxins,[2] Wayne A. Gordon, Ph.D. and Eckardt Johanning, M.D., agreed that exposure to mold caused Allison's toxic encephalopathy.

■■■ Toxic tort cases require proof of both general and specific causation about the effects of the toxic substance. *Havner*, 953 S.W.2d at 714. "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Id.* One can prove general causation either through experiments to show that a substance is capable of causing a particular injury or by attempting to show that exposure to a substance increases the risk of a particular injury. *Id.* at 714–15. Specific causation cannot be based on inferred general causation; general causation must be affirmatively proved. Among the underlying data to support Allison's proof of general causation was a study by Dr. Gordon and Dr. Johanning of twenty people who were exposed to mold in a building. The district court found that although the experts' foundational data to prove general causation met the requirements of *Daubert* and *Robinson*, the data was unreliable according to the factors discussed in *Havner*.

The question in *Havner* was whether the experts' foundational data was suffi-

ciently reliable to show that the drug Bendectin caused birth defects. In *Havner*, as here, the underlying data included epidemiological studies, which "examine existing populations to determine if there is an association between a disease or condition and a factor suspected of causing that disease or condition." *Id.* at 715. The *Havner* court determined that for an epidemiological study to be a reliable foundation, it must be unbiased in its design, otherwise properly designed, properly executed, and show that exposure to the substance more than doubles the risk of injury. *Id.* at 717–19. Another factor for determining if an epidemiological study is reliable is that it must be capable of repetition with the same results ninety-five percent of the time, known as a confidence interval of ninety-five percent. *Id.* at 723.

Allison argues that the district court incorrectly applied *Havner* because "[t]he decision clearly states that epidemiology is a permissive, not mandatory, type of evidence that a plaintiff may choose in a toxic tort case." But the *Havner* court concluded that *if* an expert relies on epidemiological studies, those studies must meet certain criteria. *Id.* Considering the totality of the evidence presented by Allison, a crucial underpinning for the opinions of Allison's causation experts was an epidemiological study; therefore, the district court appropriately determined that the factors discussed in *Havner* applied.

Dr. Gordon testified in his deposition that calculation of a confidence interval for the results of the study was "premature." A calculation of the risk factor was also premature. Additionally, Dr. Gordon could not say whether the techniques used were generally accepted. The epidemiological study on which Allison's experts relied therefore does not meet the *Havner* requirement of a ninety-five percent confi-

---

2. A "mycotoxin" is a toxic substance pro- duced by mold.

dence interval, nor does it show that exposure to the substance more than doubles the risk of injury. *Id.* at 717–18, 722–23. Further, the causation experts' testimony was not based on a reliable foundation as required by *Havner.* If an expert relies on unreliable foundational data, any opinion drawn from that data is likewise unreliable. *Id.* at 714. Because Allison did not establish a reliable foundation for the admission of general causation evidence, we need not address the evidence relating to specific causation. Therefore, we cannot say that the district court abused its discretion by excluding the testimony of Allison's causation experts. Accordingly, we overrule Allison's first issue and uphold the district court's order excluding the testimony of Allison's causation experts.

### FIE's No–Evidence Motion for Partial Summary Judgment

In his second issue, Allison contends that the district court erred in granting FIE's no-evidence motion for partial summary judgment as to Allison's personal injury claims. A party seeking a no-evidence summary judgment must assert that no evidence exists as to one or more of the essential elements of the nonmovant's claims on which it would have the burden of proof at trial. *Holmstrom v. Lee,* 26 S.W.3d 526, 530 (Tex.App.-Austin 2000, no pet.). A no-evidence summary judgment is properly granted if the nonmovant fails to bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact as to an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See* Tex.R. Civ. P. 166a(i); *Havner,* 953 S.W.2d at 711. If the evidence supporting an element rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions, then more than a scintilla of evidence exists. *Havner,* 953 S.W.2d at 711. Less than a scintilla of evidence exists when the evi-

dence is "so weak as to do no more than create a mere surmise or suspicion" of fact, and the legal effect is that there is no evidence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). A no-evidence summary judgment is essentially a directed verdict granted before trial, to which we apply a legal sufficiency standard of review. *Jackson v. Fiesta Mart,* 979 S.W.2d 68, 70 (Tex.App.-Austin 1998, no pet.).

When, as here, the summary judgment states the ground or grounds on which the district court based its decision to render summary judgment, we will affirm the summary judgment if one of those grounds is meritorious. *See State Farm Fire & Cas. Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex. 1993); *State Farm Mut. Auto. Ins. Co. v. Nguyen,* 920 S.W.2d 409, 410 (Tex.App.-Houston [1st Dist.] 1996, no writ). The district court granted the motion based on the exclusion of Allison's causation experts. Because Allison could no longer prove the essential element of proximate cause in his personal injury claims, the district court properly granted FIE's no-evidence motion for partial summary judgment as to Allison's personal injury claims. Therefore, we overrule Allison's second issue and affirm the district court's judgment dismissing Allison's personal injury claims.

### FIE'S APPEAL

FIE contends in eleven issues, with several sub-issues, that the evidence was legally and factually insufficient to support the jury's liability findings; the district court erred in denying transfer of venue to Hays County; the evidence was legally and factually insufficient to support the jury's findings that FIE failed to appoint a competent, independent appraiser and that the appraisal decision was rendered as a result of fraud, accident, or mistake; the district court abused its discretion in nu-

merous evidentiary rulings; there was no evidence of a knowing violation; the punitive damages award is excessive; there was no evidence to support the mental anguish award; there was insufficient evidence to support the attorneys' fees award; and there was no basis for the statutory penalty under article 21.55 of the insurance code. We will address the venue issue first, given the emphasis that both parties gave to this issue in their briefs and at oral argument.

### Venue

We must first decide whether venue was appropriate in Travis County, even though the property at issue is located in Hays County. In its fourth issue, FIE contends that the district court erred in denying its motion to transfer venue to Hays County. Because the civil practice and remedies code allows the interlocutory review of an order denying a motion based on mandatory venue and FIE elected not to seek such review, Ballard urges that FIE waived its right to transfer by foregoing interlocutory review. We reject this position because it is inconsistent with the permissive nature of sections 15.064 and 15.0642. Tex. Civ. Prac. & Rem.Code Ann. §§ 15.064(b), 15.0642 (West 2002) (allowing either an appeal of a venue determination after a trial on the merits or an application for writ of mandamus to enforce a mandatory venue provision). Ballard brought suit in Travis County on the permissive venue grounds that all or a substantial part of the actions giving rise to the claim occurred there and that FIE's principal place of business is there. *See id.* § 15.002(a)(1), (3) (general rule for venue). Section 15.002 lists several choices for permissive venue and applies to all lawsuits unless a mandatory venue provision or another permissive venue provision applies. *See id.* § 15.002(a).

FIE argues that venue lies in Hays County because the lawsuit is for damage to the Ballard house, which is in Hays County. Asserting that the nature of Ballard's causes of action is irrelevant, FIE further contends that "[i]f any of Ballard's causes of actions sought recovery of damage to her home, the trial court had no discretion to deny the motion." We disagree. The venue provision that FIE asserts is applicable and mandatory provides that

> [a]ctions for recovery of real property or an estate or interest in real property, for partition of real property, to remove encumbrances from the title to real property, for recovery of damages to real property, or to quiet title to real property shall be brought in the county in which all or a part of the property is located.

*Id.* § 15.011. When considering venue, we note that the legislature's use of the word "shall" in a statute generally indicates the mandatory character of the provision. *Id.* § 15.004; *Wichita County v. Hart,* 917 S.W.2d 779, 781 (Tex.1996). Because of the mandatory nature of section 15.011, we will strictly construe it and will not hold that it applies unless Ballard's suit falls clearly within one of the categories in the section. *See Bennett v. Langdeau,* 362 S.W.2d 952, 955 (Tex.1962) (concerning the predecessor to section 15.011); *Maranatha Temple, Inc. v. Enterprise Prods. Co.,* 833 S.W.2d 736, 739 (Tex.App.-Houston [1st Dist.] 1992, writ denied).

A defendant raises the question of proper venue by objecting to a plaintiff's venue choice through a motion to transfer venue. *See* Tex.R. Civ. P. 86; *Wichita County,* 917 S.W.2d at 781. That mandatory venue lies in another county provides one ground for a motion to transfer venue. *See* Tex.R. Civ. P. 86(3)(b). If a plaintiff's chosen venue rests on a per-

missive venue statute and the defendant files a meritorious motion to transfer based on a mandatory venue provision, the trial court must grant the motion. *See Wichita County*, 917 S.W.2d at 781. A trial court's erroneous denial of a motion to transfer venue requires reversal of the judgment and remand for a new trial. *See* Tex. Civ. Prac. & Rem.Code Ann. § 15.064(b); *Ruiz v. Conoco, Inc.*, 868 S.W.2d 752, 757 (Tex.1993). In determining whether venue was proper, we review the entire record, including the trial on the merits. Tex. Civ. Prac. & Rem.Code Ann. § 15.064(b); *Ruiz*, 868 S.W.2d at 758. If we find probative evidence to support the district court's determination, even if there is a preponderance of the evidence to the contrary, we will defer to the district court's determination. *Ruiz*, 868 S.W.2d at 758.

■■■ FIE argued at the hearing on its motion to transfer venue that although Ballard's case involved multiple causes of action, including breach of contract, deceptive trade practices, breach of the duty of good faith and fair dealing insurance claim, and Allison's personal injury claims, the dominant purpose of Ballard's lawsuit was to recover damages to real property. Under this test, a court looks to the dominant purpose of the lawsuit, *solely from the* facts alleged in the plaintiff's petition, the rights asserted, and the relief sought, to determine whether it falls under a mandatory venue provision. *See Maranatha Temple*, 833 S.W.2d at 738. FIE now argues on appeal that the legislature abrogated the dominant-purpose test with the enactment of section 15.004 of the civil practice and remedies code in 1995.[3] *See* Tex. Civ. Prac. & Rem.Code Ann. § 15.004 (if lawsuit has two or more claims arising from same transaction or occurrence, with one claim governed by a mandatory venue provision and another governed by a permissive venue provision, the mandatory venue provision controls); *see also Marshall v. Mahaffey*, 974 S.W.2d 942, 947 (Tex.App.-Beaumont 1998, pet. denied). We agree with FIE's current position to this extent: If we find the mandatory provision applies but it is in conflict with a permissive rule, the mandatory provision controls. Tex. Civ. Prac. & Rem.Code Ann. § 15.004; *Wichita County*, 917 S.W.2d at 781.[4] Upon our review of the record, we conclude that although section 15.011 is a mandatory venue provision, it does not apply here.

FIE argues that the phrase "recovery of damages to real property" is not ambiguous, but is instead "crystal clear." Because in 1995 the legislature reinstated the clause in section 15.011,[5] FIE urges that the mandatory venue provision was thereby broadened to include any injury to Ballard's home. By any reasonable construction, we may not read the provision by the expansive interpretation that FIE would have us adopt. Even though FIE urges this Court to read "plain and common meaning" into its reading of the statute,

3. FIE also now argues that the district court failed to recognize the abrogation of the dominant-purpose test. FIE fails to acknowledge that it based its argument at the hearing on the dominant-purpose test.

4. In light of the addition of section 15.004, we need not discuss the cases, cited by both sides, that base their reasoning on the dominant-purpose test.

5. Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3247, amended Act of May 8, 1995, 74th Leg., R.S., ch. 138, § 2, 1995 Tex. Gen. Laws 978, 980. The predecessor to section 15.011 contained the phrase "for recovery of damages to real property" until 1983. *See* Act of June 17, 1983, 68th Leg., R.S., ch. 385, 1983 Tex. Gen. Laws 2119 (Tex.Rev.Civ. Stat. Ann. art.1995, since repealed).

accepted principles of construction require that the provision in question be construed in its present context and given a rational meaning.

If we were to look at the words "recovery of damages to real property" in isolation, we would concede that the phrase may be sufficiently broad to encompass the expansive reading urged by FIE. But we do not construe statutory phrases in isolation; we read statutes as a whole. Contrary to FIE's assertion that the nature of the causes of action is irrelevant and that only the remedy sought is relevant, section 15.011 specifically addresses five types of "actions" relating to "Land"—the title of the section[6]—that mandate venue in a particular county. The *actions* are:

- for recovery of real property or an estate or interest in real property,
- for partition of real property,
- to remove encumbrances from the title to real property,
- for recovery of damages to real property, or
- to quiet title to real property.

Tex. Civ. Prac. & Rem.Code Ann. § 15.011. That the word "action" must be read to modify each of these is clear beyond cavil. Thus, we must look to the "true" nature of the action to determine whether the mandatory venue provision applies. *Renwar Oil Corp. v. Lancaster,* 276 S.W.2d 774, 775 (Tex.1955); *see also Yzaguirre v. KCS Res., Inc.,* 53 S.W.3d 368, 371 (Tex.2001).

Before the addition of the phrase "recovery of damages to real property," the venue provision applied only when the suit directly involved a question of title to land. *See, e.g., Yzaguirre,* 53 S.W.3d at 371 (mandatory venue provision does not apply because suit does not involve recov-

ering real property or quieting title); *Maranatha Temple,* 833 S.W.2d at 738; *Scarth v. First Bank & Trust Co.,* 711 S.W.2d 140, 141–42 (Tex.App.-Amarillo 1986, no writ). We have been cited to no authority that supports expanding the scope of the provision beyond questions relating to the recovery of real property or affecting title to "land." Except to make it explicit that the provision in question allows for the recovery of damages in such a suit relating to land, there is no indication that the legislature sought to broaden the provision with the addition of the phrase. That the phrase "for recovery of damages to real property" was sandwiched between "to remove encumbrances from the title" and "to quiet title" further bolsters our reading. Reading the relevant phrase in its entire context, then, gives support for the more narrow interpretation. *See* 1 Scott Brister, et al., *Texas Pretrial Practice* § 9.34 (2000).

Were we to interpret the provision to allow for mandatory venue in all instances in which any damages are sought relating to a dwelling, no matter the nature of the action, we believe we would be extending beyond permissible bounds the statute's language. The doctrine of construction, *noscitur a sociis*—a word is known by the company it keeps—seems particularly apt here to avoid ascribing to one clause a meaning so broad that it is inconsistent with its accompanying clauses, thus giving unintended breadth to the provision as a whole. *See County of Harris v. Eaton,* 573 S.W.2d 177, 181 (Tex.1978) (Steakley, J., dissenting) (discussing the maxim of *noscitur a sociis:* "the meaning of particular terms in a statute may be ascertained by reference to words associated with them in the statute; and that where two or

6. In construing a statute, we may consider and, in this case, are informed, by the stat- ute's title. *See* Tex. Govt.Code Ann. § 311.021(7) (West 1998).

more words of analogous meaning are employed together in a statute, they are understood to be used in their cognate sense, to express the same relations and give color and expression to each other."). The phrase must be understood against the background of what the legislature was attempting to accomplish in restoring a damage provision to the section, thereby completing the availability of an array of remedies to actions involving "land."

Ballard brought actions for negligence, negligence per se, breach of contract, deceptive trade practices, and breach of good faith and fair dealing in insurance claims handling, all of which allegedly caused damages to the Ballard house. Because the suit does not involve recovering real property or quieting title or seeking damages for such loss, the district court correctly concluded that the mandatory venue provisions of section 15.011 do not apply. We therefore overrule FIE's fourth issue.

### Legal and Factual Sufficiency

FIE next contends in several issues that the evidence is legally and factually insufficient to support the jury's findings. We will first address the standards of review for challenges to legal and factual sufficiency. Challenges to the legal sufficiency of the evidence must be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence established conclusively the opposite of a vital fact. *See Havner*, 953 S.W.2d at 711. In reviewing legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See*

*Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994).

If a party is attacking the legal sufficiency of an adverse finding of an issue on which it did not have the burden of proof, the attacking party must demonstrate on appeal that there is no evidence to support the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). In reviewing a no-evidence issue, we are to consider only the evidence favoring the finding, disregarding all direct and circumstantial evidence to the contrary. *Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex.2002); *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996).

When reviewing a challenge to the factual sufficiency of the evidence, we must consider, weigh, and examine all of the evidence in the record. *See Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). If a party is attacking the factual sufficiency of an adverse finding on an issue to which the other party has the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. *See Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.-Austin 1992, no writ). In reviewing a factual insufficiency of the evidence challenge, we must first consider all of the evidence that supports and is contrary to the jury's determination. *See Plas–Tex*, 772 S.W.2d at 445. We should set aside the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We may not reverse merely because we conclude that the evidence preponderates toward an affirmative answer. *See Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988). To assist with the analysis of FIE's legal and factual sufficiency chal-

lenges, we will summarize FIE's acts of which Ballard complains.

### The Complained-of Acts

Although the trial was long and the arguments complex, each of Ballard's causes of action revolve around the following core of complained-of acts:

#### 1. Plumbing test

As part of FIE's insurance code violation, Ballard complains that Theresa McConnell misrepresented to her that "complete" plumbing tests had been performed on the house even though McConnell "secretly" thought that there might be other leaks. In December 1998, Ballard reported a claim that her hardwood floor was water-damaged. FIE retained the Gerloff Company, a plumbing contractor, to determine whether there was an ongoing leak causing the floor to remain wet. On January 11, 1999, McConnell forwarded a copy of the Gerloff report to Ballard. The report described the procedures employed and time taken to test the building drain piping, domestic water piping, and air conditioning condensate lines, and further stated that no shower pan test was conducted. Enclosing a copy of the plumbing test results, McConnell represented in a cover letter that "[c]omplete plumbing tests of your residence were performed.... No leaks were located in the plumbing system of your residence." A Gerloff plumber testified that the tests were complete according to his company's procedures. He testified that he was asked to do a complete test and that it was a "complete test of the plumbing system, going by our procedures." The tests were complete in the context of the leaks that existed on December 30, 1998, when the testing was done. McConnell's concerns about the possibility of additional leaks were not secret. Despite the report that no leaks were found, she contacted Jeff Jackson, a civil engineer, to determine the amount and cause of damage to the hardwood floor. In her cover letter enclosing the Gerloff report, McConnell stated that Jackson had been retained in the investigation of the claim and the "cause of the problem" continued.

#### 2. Completion-of-claim letter

McConnell wrote a letter to Ballard on February 8 saying that FIE required a forty-five-day extension because "[t]he additional time is needed to complete our claim investigation." McConnell admitted at trial that FIE had all of the information that it needed to evaluate the claim but that she needed the additional time to obtain the authority from supervisors to pay the claim because she did not have that level of authority. FIE paid the claim on February 24, 1999, less than three weeks after McConnell's letter.

#### 3. Refusal to pay claim/failure to promptly pay

Ballard also argues that FIE violated the insurance code because FIE admitted that as of May 17, 1999, it had obtained all of the information it needed to pay for remediation of the house. She urges that FIE tendered insufficient and untimely payments. Because of FIE's piecemeal payments and intentional delays in paying her claims after it had all of the information it needed on May 17, 1999, Ballard contends that FIE refused to pay the claims without conducting a reasonable investigation of the claims and that it failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claims when its liability had become reasonably clear.

FIE paid the first claim for hardwood floor damage on February 24, 1999. It based the payment on a bid from Boatright Floors, less depreciation and the deductible. FIE paid the depreciated value instead of replacement cost because the

house was underinsured. Ballard immediately claimed that this was a partial payment because she thought the Boatright bid was too low. Thereafter, Ballard began submitting other claims. Within the next couple of months, she submitted a claim for a shower leak, ice maker leak, and supplemental damage to sheet rock and walls. FIE paid all of these claims, which Ballard again accepted as partial payments. Nevertheless, Ballard contends that because of the completion-of-claim letter, plumbing test letter, and FIE's invocation of the appraisal provision, full payment of these claims and other pending claims was delayed.

### 4. Denial of coverage

Ballard argues that FIE tried to deny the hardwood floor damage claim under an exclusion in the policy for foundation problems. The first adjuster to handle the claim was Sean Dollery, who visited the home on December 22, 1998. Although his initial reaction was that foundation settling might be the cause of the hardwood floor damage, he changed his mind after seeing the water damage to the floor. In response to her attorney's question—"About how long did he talk to you about this being a slab settling problem?"—Ballard testified: "Until Richard Roberts got there [that day] and started pulling up boards that showed the migration of water." Dollery stopped suggesting that it was a slab-settling problem "about 20 minutes after Richard Roberts had pulled up some boards." From then on, FIE handled the hardwood floor damage as a covered claim.

### 5. Sham and fraudulent bids

Ballard complains that FIE intentionally paid her inadequate sums based on sham and fraudulent bids FIE received from contractors who subsequently refused to perform the work for the amount of the bids. These contractors were then retained by FIE as its experts in this litiga-

tion. FIE obtained bids from many contractors during the course of handling the claims and paid the claims according to its own valuation, assisted by the bids. FIE based the hardwood floor claim payment on a bid from Boatright Floors, which was the lowest bid that it received. Ballard contends that the payment was invalid because the Boatright bid was only good for thirty days and had expired by the time that FIE made the payment on February 24, 1999. FIE counters that it did not receive the bid until February 5, just a few weeks before it made payment. After mold was discovered in the Ballard home, FIE hired Rimkus Consulting to prepare a remediation bid. Because Rimkus had no experience in the relatively new field of mold remediation, its engineers talked with Ballard's consultants to find out more about the process. The remediation bid that Rimkus submitted in preparation for mediation was considerably less than the bid from Ballard's experts.

Ballard also contends that FIE based its August 1999 payments on expired bids, because two companies that had made bids would not do the work for Ballard at the prices they had quoted to FIE. But by that time they had been retained as FIE's expert witnesses. Ballard further contends that de la Mora's estimates during the appraisal process were not based on like kind and quality. De la Mora testified that he determined like kind and quality replacement costs during the appraisal process. One of the contractors who submitted a bid to de la Mora also testified that he prepared his bid based on like kind and quality materials.

### 6. Invocation of the appraisal provision

Ballard urges four complaints concerning FIE's invocation of the appraisal provision: (i) the mere invocation of the provision was a breach of its duty of good faith

and fair dealing because it was intended for the purposes of delay and to gain leverage in negotiations; (ii) FIE deliberately appointed an appraiser who was not independent or competent; (iii) FIE refused to include all of the pending claims in the appraisal; and (iv) FIE intentionally withheld estimates and information from its own appraiser.

Under Ballard's standard form homeowner's insurance policy, either party may request an appraisal if it becomes apparent that the parties cannot agree on the value of a claim or claims. FIE's employees testified that they invoke the appraisal provision rarely, only if it is apparent that the parties cannot agree on the appraised value. FIE asserted the provision here after an attempt to settle at mediation failed, although it was apparent long before then that Ballard and FIE did not agree about the value of her claims.

Peter de la Mora, a structural engineer who was FIE's appraiser, had a business relationship with FIE before working on this appraisal. However, he has never been an employee of FIE. Further, FIE instructed de la Mora to determine costs on his own, not from any figures that FIE had. He had no restriction on receiving assistance from outside experts. He had years of experience in the homebuilding industry.

The letter invoking the appraisal provision listed three of the five claims that were pending as of late May 1999. Ballard testified that she asked FIE to include all of the claims in the appraisal but that FIE did not want to do that, suggesting the appraisal did not cover all of her claims. De la Mora testified that although the appraisal did not include all of the claim numbers, the fact that the appraisal covered the entire house encompassed all of claims. Additionally, the amendment to the appraisal decision stated that because

"some of the claim numbers may have been improperly included, and [o]thers may have been improperly excluded," "the Appraisal Decision was intended to be a comprehensive statement" of the cost to remediate or replace the house, its contents, the groundskeeper's house, plus additional living expenses, "considering only those claims which were properly subject to the appraisal."

7. Underinsurance

The amount of insurance on the Ballard home was tied to the county tax appraisal, not the resale value of the house. In 1996, Ballard's agent told her that the insurance coverage was insufficient to cover the full value of the home. She replied that she wanted to keep the insurance at the value of the tax appraisal, then signed a form rejecting an increase in coverage. The amount of insurance on the home when Ballard filed the hardwood damage claim was $313,000. McConnell, concerned that the house might be underinsured, requested a property appraisal in January 1999. After seeing that the appraised resale value was approximately $750,000, Ballard requested an increase in her insurance coverage. Because this increase did not occur until after the payment of the first claim, FIE imposed an underinsurance penalty on its payment of the hardwood floor claim. It paid Ballard for the actual cash value of the floor, deducting depreciation, instead of paying the full replacement value. Ballard contends that FIE thus misrepresented that her policy covered replacement costs.

8. Reservation-of-rights letter

On December 30, 1998, FIE sent a standard form homeowner's policy reservation-of-rights letter, which restated exclusions from the policy that might apply. Insurance companies must assert a reservation of rights or risk waiving any coverage

defenses that they may have. *See, e.g., State Farm Lloyds v. Borum*, 53 S.W.3d 877, 892 (Tex.App.-Dallas 2001, pet. denied). The fact that the form letter contained inapplicable exclusions for damage by "waves" and "earthquake" is inconsequential. Furthermore, there was no evidence of any connection between this letter and how FIE handled Ballard's claims, and coverage was not at issue.

Having summarized FIE's acts of which Ballard complains, we now turn to FIE's legal and factual sufficiency challenges to the jury's findings.

### Breach of Duty of Good Faith and Fair Dealing

FIE urges in its first issue that the evidence is legally and factually insufficient to support the jury's finding that it breached its duty of good faith and fair dealing toward Ballard. FIE further contends that the evidence is legally and factually insufficient to support a finding that its alleged breach caused damages to Ballard. We disagree. Some evidence supports the jury's finding that FIE breached its duty of good faith and fair dealing and that the breach caused damages to Ballard.

An insurer breaches its duty of good faith and fair dealing by denying or delaying payment of a claim when "the insurer's liability has become reasonably clear." Tex. Ins.Code Ann. art. 21.21, § 4(10)(a)(ii) (West Supp.2003); *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 55 (Tex.1997); *id.* at 69 (Hecht, J., concurring). "Liability for payment of a claim is reasonably clear when it is no longer fairly debatable." *Giles*, 950 S.W.2d at 69 (Hecht, J., concurring). The statutory standard and common-law standard for breach of the duty of good faith and fair dealing are identical. *Mid–Century Ins. Co. v. Boyte*, 80 S.W.3d 546, 549 (Tex.2002) (citing *Giles*, 950 S.W.2d at 55; *id.* at 69

(Hecht, J., concurring)). Evidence establishing only a bona fide coverage dispute does not demonstrate breach of the duty of good faith and fair dealing. *Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 193 (Tex.1998); *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex.1997); *Moriel*, 879 S.W.2d at 17.

The issue of the breach of the duty of good faith and fair dealing "focuses not on whether the claim was valid but on the reasonableness of the insurer's conduct" in handling the claim. *Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597, 601 (Tex.1993). Reasonableness is determined using an objective standard of whether a reasonable insurer under similar circumstances would have delayed or denied payment of the claim. *Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex. 1988). Whether an insurer breached its duty of good faith and fair dealing is a fact issue. *Giles*, 950 S.W.2d at 56. Moreover, the question of whether an insurer's conduct is reasonable in the face of acknowledged liability is one peculiarly tailored to the province of the jury. *See id.* In determining whether the evidence is legally sufficient to support a judgment for breach of the duty of good faith and fair dealing, we resolve all conflicts in the evidence and draw all inferences in favor of the jury's findings. *Id.* at 51.

There is some evidence from which a jury could find that FIE failed to attempt in good faith to effectuate prompt, fair, and equitable settlement of claims after its liability had become reasonably clear. *See* Tex. Ins.Code Ann. art. 21.21, § 4(10)(a)(ii); *Giles*, 950 S.W.2d at 56. FIE does not challenge that its liability was reasonably clear. Its liability was only "fairly debatable" for a brief time, when FIE's outside investigator, Sean Dollery, expressed his preliminary view that

the claim might not be covered. *See Giles*, 950 S.W.2d at 69 (Hecht, J., concurring). Ballard contends that FIE, after its liability had become reasonably clear, delayed payment of the hardwood floor claim through its plumbing test and completion-of-claim letters. She further contends that FIE breached its duty of good faith and fair dealing toward her by invoking the appraisal provision in May 1999, when at the same time it had all of the information that it needed to pay for remediation of the home. She argues that waiting for payment of her claims during the eighteen-month appraisal process allowed mold to spread and cause irreparable damage to the house. While Ballard alleges that other acts are part of the pattern of acts that violated article 21.21, these are the primary acts of which she complains.

Some evidence shows that McConnell's lack of authority or experience in handling claims of this magnitude caused delays in processing the claims. McConnell knew on the first day she received the claim that estimates to replace the hardwood floor were over $100,000. She had a level of authority only to pay claims up to $20,000 and had never worked on a claim this large. Additionally, McConnell testified that she had sufficient information that liability was reasonably clear on the hardwood floor claim as of February 1, 1999. Yet she wrote the February 8 letter to Ballard, stating that FIE required a forty-five-day extension because "[t]he additional time is needed to complete our claim investigation." McConnell admitted at trial that FIE had all of the information that it needed to *evaluate* the claim but that she needed the additional time to obtain the authority from supervisors to *pay* the claim because she did not have that level of authority. A jury could have found that she misrepresented to Ballard why she needed more time to handle the claim. Ballard argues also that McConnell made

a misrepresentation in the "complete plumbing test" letter, when in fact not all plumbing had been tested. Both McConnell and a plumber with the Gerloff Company testified that the term "complete plumbing test" is not literally true, because the standard industry test runs through underground systems only, not any pipes above the first floor. Although McConnell correctly characterized the test that Gerloff performed, the jury could have reasonably concluded that this statement was a misrepresentation.

Other evidence called into question FIE's good faith handling of the claims. Ballard testified that although she "begged" to remove the wood floor because it was a tripping hazard, McConnell told her that she would "jeopardize coverage" if she removed the floor. McConnell testified that Ballard could have removed the floor at any time after payment of the $108,000 to replace the floor. Ballard countered that she did not want to remove the floor with the claim investigation ongoing for months, even after she received the $108,000 payment. She testified that she did not remove the floor "[b]ecause [FIE] kept calling for inspections. And if I had torn up the floor, there would be nothing there for them to inspect." As part of the pattern of mishandling and delay in handling her claims, Ballard also testified that FIE's large number of inspections were designed to harass and cause further delay. McConnell countered that the inspections were necessary to determine the cause of the water damage and because Ballard kept submitting claims for new damage. The jury, as the trier of fact in this case, could have chosen to believe Ballard instead of McConnell. A jury judges the credibility of witnesses and the weight given their testimony. *Ford v. Panhandle & Santa Fe Ry. Co.*, 151 Tex. 538, 252 S.W.2d 561, 563 (1952); *Trinity*

*Indus., Inc. v. Ashland, Inc.,* 53 S.W.3d 852, 862 (Tex.App.-Austin 2001, pet. denied). It is the jury's province "to resolve conflicts and inconsistencies ... in the testimony of different witnesses." *Ford,* 252 S.W.2d at 563.

Further, Ballard presented some evidence of a pattern of failure to promptly pay that caused further damage to the house. The jury heard evidence that FIE had all of the information that it needed to pay the hardwood floor claim in early February but did not pay the claim until three weeks later. Further, Ballard contended that every payment from FIE was insufficient to pay for the damage, leading to further delays that caused the mold to spread. The jury heard additional evidence that although McConnell admitted that FIE had all of the information that it needed to pay for remediation of the house as of May 17, 1999, FIE instead invoked the appraisal provision after it failed to settle the claims at mediation. During the appraisal process, which lasted eighteen months, nothing was done to remediate the mold in Ballard's house. The mold continued to grow. This was some evidence from which the jury could have determined that FIE delayed in paying the claims and that the delay caused further damage to Ballard's house.

An appellate court may not substitute its judgment when a jury's finding is grounded in sufficient evidence. *Trinity Indus.,* 53 S.W.3d at 862–63. We are required by the standards and scope of review to credit verdicts grounded on probative evidence. Further, the legislature requires us to "liberally construe[ ]" article 21.21. Tex. Ins.Code Ann art. 21.21, § 1(b) (West Supp.2003) ("This Article shall be liberally construed and applied to promote its underlying purposes as set forth in this section."); *see also Rocor Int'l, Inc. v. National Union Fire Ins.*

*Co.,* 77 S.W.3d 253, 260 (Tex.2002); *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 384 (Tex.2000).

Viewing the evidence in the light most favorable to Ballard, we hold that there is some evidence to support the jury's finding that FIE failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Ballard's claims after its liability had become reasonably clear and that this failure caused damages to Ballard. *See* Tex. Ins.Code Ann art. 21.21, § 4(10)(a)(ii). Weighing all of the evidence, we cannot say that it is so weak as to be clearly wrong or manifestly unjust. *Cain,* 709 S.W.2d at 176. Accordingly, FIE's legal and factual sufficiency challenges to the breach of the duty of good faith and fair dealing finding must fail. We overrule FIE's first issue. Even if we were to apply the standard for breach of the duty of good faith and fair dealing set forth in *Aranda v. Insurance Co. of North America*—that FIE had no reasonable basis for delaying payment of the benefits of the policy and that it knew or should have known that it had no reasonable basis for delaying payment—the evidence would support the finding. *See* 748 S.W.2d at 213.

Because the court's charge specified that a finding of a breach of the duty of good faith and fair dealing is sufficient to uphold the jury's award of actual damages, we affirm the actual damages award in part, in the amount of $4,006,320.72, in addition to prejudgment and postjudgment interest as stated in the final judgment. This amount takes into account the reduction in the final judgment for the $2,045,204.28 that FIE had previously paid to Ballard, information that the court's charge did not present to the jury. Elsewhere in the opinion, we will discuss the $176,000 award for Ballard's reasonable and necessary costs of the appraisal process.

### DTPA Violation, Unconscionability, and Fraud

FIE contends in its second issue that the evidence is legally and factually insufficient to support the jury's findings that FIE engaged in deceptive trade practices, unconscionable conduct, and fraudulent conduct. Ballard counters that FIE waived this argument because it did not properly brief this issue. *See* Tex.R.App. P. 38.1(h). Because FIE's argument on this issue is grounded in its lengthy discussion that it did not breach its duty of good faith and fair dealing, we find that FIE sufficiently briefed this issue for the Court. The jury found that FIE violated the DTPA by engaging in a false, misleading, or deceptive act or practice by (1) representing that services had or would have characteristics or benefits that they did not have, (2) representing that services are or will be of a particular standard or quality when they were of another, (3) representing that an agreement confers or involves rights, remedies, or obligations that it did not have or involve, or (4) representing that work or services have been performed, when the work or services were not performed. *See* Tex. Bus. & Com. Code Ann. § 17.46(b)(5), (7), (12), (22) (West 2002).

 Ballard contends that the plumbing test letter was a misrepresentation about work performed. We agree that this is some evidence to support the jury's finding of a DTPA violation. The jury may have reasonably concluded that McConnell's characterization of the test was a misrepresentation of work performed. Additionally, the jury could have concluded from the evidence that Ballard's reliance on the plumbing test letter caused further damages to the house. Viewing the evidence in the light most favorable to Ballard, the evidence is legally sufficient to support the jury's finding that FIE committed a DTPA violation. Weighing all of the evidence, we cannot say that it is so weak as to be clearly wrong or manifestly unjust. *Cain*, 709 S.W.2d at 176. We overrule this part of FIE's second issue and affirm the jury's finding that FIE committed a DTPA violation.

The jury also found that FIE engaged in an unconscionable action or course of action, which is "an act or practice that, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com.Code Ann. § 17.45(5)(A) (West 2002). "Gross," as used in this section, means "glaringly noticeable, flagrant, complete and unmitigated." *Nicolau*, 951 S.W.2d at 451. Ballard's sole contention in this regard is that any misrepresentation by FIE equates with unconscionable conduct. That is not the law. "[N]ot every misrepresentation of fact, even an intentional one, constitutes unconscionable conduct." *Latham v. Castillo*, 972 S.W.2d 66, 72 (Tex.1998). The test is whether the consumer was taken advantage of to a grossly unfair degree. *Id.* The record does not provide support to satisfy this test. Having reviewed the record, we find no evidence to support the finding that FIE engaged in an unconscionable action or course of action.

The jury further found that FIE committed fraud against Ballard. A fraud cause of action requires: (1) a material misrepresentation, (2) that was either known to be false when made or was asserted without knowledge of its truth, (3) that was intended to be acted upon, (4) that was relied upon, and (5) that caused injury. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001). Ballard makes no citation to the record to support her fraud claim, nor does she point to any actions that might have been fraudulent. In our review of the record, we find no

evidence to support this claim. Having found sufficient evidence to support the jury's finding of a DTPA violation, but no evidence to support the jury's findings of unconscionability and fraud, we overrule FIE's legal and factual sufficiency challenge to the DTPA violation finding and sustain FIE's challenges to the unconscionability and fraud findings. Therefore, we affirm the jury's finding that FIE committed a DTPA violation. The court's charge specified that a finding of a DTPA violation is sufficient to uphold the jury's award of actual damages. Based on this finding, we affirm the actual damages in the amount of $4,006,320.72, in addition to prejudgment and postjudgment interest as stated in the final judgment. We reverse the jury's findings that FIE engaged in unconscionable and fraudulent conduct and render judgment that Ballard take nothing on her claims for unconscionability and fraud.

### Appraisal Decision

FIE contends in its third issue that Ballard is bound by the appraisal decision because the evidence is legally and factually insufficient to support the jury findings that the appraisal was the result of fraud, accident, or mistake and that the appraiser was not competent and independent. FIE further contends that Ballard waived any complaints about de la Mora because she did not challenge him as the appraiser until after the appraisal decision was made.

 An appraisal decision made pursuant to the provisions of an insurance contract is binding and enforceable. *Wells v. American States Preferred Ins. Co.*, 919 S.W.2d 679, 683 (Tex.App.-Dallas 1996, writ denied). Every reasonable presumption will be indulged to sustain an appraisal decision. *Providence Lloyds Ins. Co. v. Crystal City Indep. Sch. Dist.*, 877 S.W.2d 872, 875 (Tex.App.-San Antonio 1994, no

writ). An award may be set aside in three instances: when it was (1) made without authority; (2) the result of fraud, accident, or mistake; or (3) not made in substantial compliance with the terms of the contract. *Wells*, 919 S.W.2d at 683; *Providence Lloyds*, 877 S.W.2d at 875–76.

Ballard's homeowner's insurance policy, a standard form policy promulgated by the Texas Department of Insurance, contains an appraisal clause. Under this clause, either party may invoke an appraisal if the party disagrees about the value of a claim or claims. Each party then hires its own appraiser. If the two appraisers cannot agree on the value, they select an umpire, or a district judge will appoint one if the appraisers cannot agree on an umpire. A decision signed by any two of the three is binding as to the value of the claim.

FIE invoked the appraisal provision on May 27, 1999, the day that the parties failed to reach a settlement at mediation. FIE chose as its appraiser Peter de la Mora, a structural engineer who had performed appraisals for FIE approximately four or five times. Ballard chose an attorney as her appraiser, who had to resign a few months later because of trial obligations. Both parties agreed that Michael Schless, a former county court at law judge, would be the umpire. Ballard then chose another attorney, Mike Duffy, as her successor appraiser in November 1999.

Over the course of the next year, the appraisers gathered estimates for remediation and replacement of the Ballard house. In November 2000, de la Mora, Duffy, and Schless worked for four days to determine the appraisal decision. They met at the Ballard house with various experts, then de la Mora and Duffy discussed their proposals with Schless. On November 16, 2000, they issued an appraisal decision in the amount of $1,287,092.72, which took into account payments that FIE had

already made to Ballard. Both appraisers and Schless signed the decision, but Duffy, Ballard's appraiser, disputed the amount of the award. Under the terms of the insurance policy, the appraisal decision was binding because two of the three agreed on the amount. FIE then sent checks to Ballard's attorney for the amount of the appraisal decision. De la Mora and Schless issued an amendment to the appraisal decision on January 30, 2001, to reflect the intent of the decision to be a "comprehensive statement of the actual cash value to replace or remediate the structure of the residence and the groundskeeper's house, the contents of the residence, and the alternative living expenses, considering only those claims that were properly subject to the appraisal." Duffy did not participate in the amendment because he no longer had authority to act on behalf of Ballard.

■■■ We will first address FIE's preliminary issue that Ballard waived her right to challenge de la Mora as FIE's appraiser because she did not raise the issue until after the appraisal decision was made. Having learned from de la Mora's deposition, taken soon before the appraisal decision, that he had previously done work for FIE, Ballard contended in an amended petition that the appraisal decision should be set aside. She claimed that FIE breached the insurance contract by selecting an appraiser who was neither competent nor independent. The effect of an appraisal decision is to estop one party from contesting the issue of the value of damages in a suit on the insurance contract. *Hennessey v. Vanguard Ins. Co.,* 895 S.W.2d 794, 797–98 (Tex.App.-Amarillo 1995, writ denied). As with other affirmative defenses, it is the defendant's burden to raise the issue of estoppel, Tex.R. Civ. P. 94, which FIE did in an amended answer. Ballard has arguably waived any challenge because she did not oppose FIE's appraiser until after determination of the appraisal. We will nevertheless address FIE's legal and factual sufficiency challenges to the jury's findings concerning the appraisal.

FIE argues in a sub-issue concerning the appraisal that the evidence is legally and factually insufficient to support the finding that the appraisal decision was rendered as a result of fraud, accident,[7] or mistake. In question seven of the charge, the jury was instructed that fraud means in part that a material misrepresentation was made and that the speaker made the misrepresentation with the intent that the other party act on it. Ballard contends that the jury had sufficient evidence to find fraud because the appraiser intentionally prevented Ballard from receiving like kind and quality replacement, failed to use available price and quality information, intentionally excluded items from the appraisal process, and based his calculations on fraudulent bids from unqualified contractors. There is no evidence in the record to support these contentions. For example, although Ballard claims that de la Mora intentionally prevented her from receiving like kind and quality replacement, de la Mora testified that he determined like kind and quality replacement costs during the appraisal process. One of the contractors who submitted a bid to de la Mora also testified that he prepared his bid based on like kind and quality materials. Despite the allegation, we find no evidence from which a reasonable jury could infer that the appraiser intentionally prevented Ballard from receiving like kind and quality replacement.

■■■ The evidence also does not show that anyone intentionally excluded items

---

7. Ballard does not contend that the appraisal

decision was rendered as a result of accident.

from the appraisal. At oral argument, Ballard contended that she wanted to submit "everything" in the appraisal but that FIE refused. Although Ballard made fourteen separate claims between December 1998 and August 1999, she had only submitted five claims by the time the appraisal process began in May 1999. FIE's May 27, 1999 letter listed only three of those five claims, but de la Mora testified that because the entire house had to be remediated, it did not matter which claim numbers were included. Additionally, the amendment to the appraisal decision stated that the decision "was intended to be a comprehensive statement" of the cost to remediate or replace the house, its contents, and the groundskeeper's house, plus additional living expenses. There is no evidence that de la Mora or FIE intended to exclude items from the appraisal. Likewise, de la Mora's reliance on bids from contractors that he chose does not rise to the level of fraud. Ballard opposed the bids because some of the contractors had done previous work for FIE and because some of the contractors, such as the mold remediation company, had never submitted bids for work of this magnitude. A lack of experience does not equate with making material misrepresentations in a bid. Given that mold claims were still relatively novel in April 1999, when mold was discovered in Ballard's house,[8] it is not surprising that the contractors had little experience in the area of mold remediation.

Ballard objects to the bids solicited by de la Mora in part because she does not agree with the valuation of the repair and replacement costs. "[A] finding of disparity, even gross disparity, between an appraisal award and the cost of repair, cannot support a finding of bias or partiality without additional evidence." *Hennessey,* 895 S.W.2d at 799. Ballard fails to cite to any additional evidence. Based on our review of the record, we cannot find any evidence from which a reasonable jury could infer that the appraisal decision was rendered as a result of fraud.

■ Ballard argues that the appraisal decision was also rendered as a result of mistake because it listed "alternative living expenses" instead of "additional living expenses" for the costs of Ballard's family living away from their house. The jury was instructed that "mistake" means a situation in which the appraisers were operating under a mistake of fact such that their award does not speak to their intention or that the error in the award is so great that it shows gross partiality, undue influence, or corruption. Here, the "mistake" about which Ballard complains is similar to a clerical error. De la Mora testified that the term "alternative living expenses" was intended to be the same as "additional living expenses" and that the mere difference in wording did not affect the appraisal process. A clerical error that does not affect the intention of the appraisers cannot support a finding of mistake. *See Providence Lloyds,* 877 S.W.2d at 878 (column labeled "court award" instead of "agreed award" did not constitute a mistake). Based on our review of the record, we cannot find sufficient evidence to support a finding that the appraisal was rendered as a result of mistake. Viewing the evidence in the light most favorable to Ballard, the evidence is legally insufficient to support the jury's finding that the appraisal decision was the result of fraud, accident, or mistake. Weighing all of the

---

**8.** In 2001, "Farmers registered more than 12,000 mold claims, up from 12 in 1999. Allstate says its monthly tally of such claims in Texas climbed to 1,000 in the first three months of this year, up from 40 a year ago." *Harsh Policies: Hit With Big Losses, Insurers Put Squeeze on Homeowners,* Wall Street Journal, May 14, 2002, at A1.

evidence, the evidence is also factually insufficient to support the jury's finding that the appraisal decision was the result of fraud, accident, or mistake. We therefore sustain FIE's sub-issue, reverse the jury's finding, and render judgment on this finding in favor of FIE.

■ FIE contends in its second sub-issue concerning the appraisal that the evidence is legally and factually insufficient to support the finding that FIE failed to appoint a competent, independent appraiser. We agree. Ballard attempted to prove lack of independence because de la Mora had a pre-existing business relationship with FIE. However, Ballard presented no evidence that FIE influenced or exercised control over de la Mora. There is no evidence that de la Mora ever was an employee of FIE or had a financial interest in the claims. Instead, Ballard's evidence shows an arm's-length business relationship between FIE and de la Mora, which was fully disclosed before the appraisal decision.

Ballard presented evidence that: de la Mora's company performed twenty to twenty-five percent of its work for FIE and eighty percent of its work overall for insurance companies; de la Mora had performed four or five appraisals for FIE before the Ballard appraisal; and that de la Mora had worked with FIE's attorney ten times since 1996. The showing of a pre-existing relationship, without more, does not support a finding of lack of independence. *Gardner v. State Farm Lloyds,* 76 S.W.3d 140, 143 (Tex.App.-Houston [1st Dist.] 2002, no pet.). De la Mora has never been an employee of FIE. Further, FIE instructed de la Mora to determine costs on his own, not from any figures that FIE provided. FIE never told him how to estimate the costs. He had no restriction on receiving assistance from outside experts. As an independent contractor, de la

Mora amply demonstrated that despite his previous business dealings with FIE, he exercised independent judgment in the appraisal process; Ballard has directed us to no evidence to the contrary, and we cannot find any support for her position in the record.

Ballard attempted to prove lack of competence on the ground that de la Mora had no experience with molds or mold remediation. The evidence shows, however, that de la Mora was competent as an appraiser. He has a degree in civil engineering, is a registered professional engineer, has thirty-three years of experience in structural engineering, and has built hundreds of houses, including houses comparable to the Ballard house. Because he had no experience with mold remediation, he retained mold experts to assist him with the remediation estimate. This was no different than Ballard's appraiser, an attorney, retaining mold experts to assist him with his estimates. Viewing the evidence in the light most favorable to Ballard, we conclude that the evidence is legally insufficient to support the jury's finding that FIE failed to appoint a competent, independent appraiser. Weighing all of the evidence, the evidence is also factually insufficient to support the jury's finding that FIE failed to appoint a competent, independent appraiser. We therefore sustain FIE's sub-issue, reverse the jury's finding, and render judgment on this finding in favor of FIE.

Because we conclude that the appraisal was not rendered as a result of fraud, accident, or mistake and that the appraiser was competent and independent, the appraisal decision is binding and enforceable. *Wells,* 919 S.W.2d at 683. We thus sustain FIE's third issue. Under the terms of the insurance contract, each party must pay its own appraiser and bear the other expenses of the appraisal and umpire equally.

Therefore, we reverse the jury's award of $176,000 to Ballard for her reasonable and necessary costs of the appraisal process and render that Ballard take nothing on this claim. Given, however, that Ballard's claim for breach of the duty of good faith and fair dealing is statutorily based and extra-contractual, outside of the bounds of the appraisal decision, Ballard's damages are not limited to the amount of the appraisal decision.

### Knowing Violation

In its seventh issue, FIE challenges the legal sufficiency of the jury's finding that FIE knowingly engaged in deceptive acts or practices toward Ballard, contending that there is no evidence to support this finding. We agree. "Knowingly," as the district court correctly charged the jury, is the "actual awareness of the falsity, unfairness, or deception of the conduct in question." Tex. Bus. & Com.Code Ann. § 17.45(9) (West 2002). "[A]ctual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness." Id. "Actual awareness" does not mean merely that a person knows what he is doing; rather, it means that a person knows that what he is doing is false, deceptive, or unfair. In other words, a person must think at some point, "Yes, I know this is false, deceptive, or unfair to [the other person], but I'm going to do it anyway." St. Paul Surplus Lines Ins. Co. v. Dal–Worth Tank Co., 974 S.W.2d 51, 53–54 (Tex.1998). Actual awareness is more than conscious indifference toward another's rights or welfare. Id. at 54. We must affirm the jury's finding if we find more than a scintilla of evidence that FIE's conduct fit within the definition of "knowingly." See Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex.1995).

There is some evidence from which the jury could have found that FIE breached its duty of good faith and fair dealing toward Ballard, but there is no evidence in the record that FIE was actually aware that its actions toward Ballard were false, deceptive, or unfair—that is, that FIE was more than consciously indifferent to Ballard's rights and welfare. Under the St. Paul Surplus test, relied upon by both parties, we must find that someone with FIE must have had a subjective awareness of the falsity, deception, or unfairness before FIE may be held to have acted knowingly. Ballard admits that a single act does not rise to the level of knowing conduct and without citation to the record tries to paint a "knowing" picture from the pattern of acts relied upon for her lack of good faith and fair dealing claim. Ballard contends, for example, that McConnell's plumbing test letter was a knowing misrepresentation. McConnell based this statement on information that she received from the plumbing company, and we cannot say this is evidence from which a reasonable jury could infer that McConnell made a knowing misrepresentation. She had no conversation with Ballard about the plumbing test, instead simply forwarding information after she received the report from the plumbing company. Additionally, FIE relied on the statement that "complete plumbing tests" were made as much as Ballard did.

Ballard further argues that FIE knowingly refused to pay an estimate from one of its bidders. Ballard makes no citation to the record for this contention, and we cannot find any support for it in our review of the record. Ballard next contends that FIE "intentionally withheld" approved claim funds to gain leverage to settle all matters in controversy. We disagree. Although the first payment for the hardwood floor damage may have taken longer than necessary, FIE did pay all but one of Ballard's claims, both before and

after she filed suit against FIE. The record does not contain evidence that FIE knowingly withheld claim payments to gain leverage.

Ballard also argues that FIE intentionally made payments based on sham and fraudulent bids from contractors who refused to perform work for the amount of the bids and who were retained as FIE's experts. Although "sham and fraudulent bids" was one of Ballard's themes during the trial, we cannot find any evidence to support this theme. FIE obtained bids from many contractors during the course of handling the claims and paid the claims according to its own valuation, assisted by the bids. Ballard also attempted to show that FIE based its payments on expired bids, because two companies that had made bids would not do the work for Ballard at the prices they had quoted to FIE. They in fact would not do the work because they had been retained as FIE's expert witnesses by that time. Both Ballard and FIE hired contractors involved in the claims as its experts in the trial, which is not itself unreasonable because they were familiar with the damage to the Ballard home. The record does not contain evidence that any of FIE's conduct concerning its bids from contractors was knowingly false, deceptive, or unfair.

Ballard next argues that FIE improperly invoked the appraisal provision to gain leverage against her. FIE had a right to invoke the appraisal provision under the terms of the homeowner's insurance policy and did so when mediation attempts failed. *See, e.g., Gardner,* 76 S.W.3d at 142. There is no evidence in the record from which a reasonable jury could infer that this conduct was knowingly false, deceptive, or unfair. Nor was the appointment of an appraiser with a previous business relationship with FIE evidence of knowing conduct. A previous business relationship,

standing alone, is not probative of knowingly false, deceptive, or unfair conduct. *Id.* at 143. De la Mora disclosed his relationship with FIE in his deposition, taken before the appraisal decision was issued. Ballard did not object to de la Mora until *after* receiving that decision.

Finally, Ballard argues that FIE intentionally withheld estimates and information from de la Mora. De la Mora testified, however, that FIE told him that he had to arrive at his own estimates, independent of anything that FIE had. FIE did so because the insurance policy required that de la Mora be independent. Complying with the terms of the insurance policy is no evidence of knowingly false, deceptive, or unfair conduct. The only evidence that might support a finding of knowing conduct, which Ballard did not raise with regard to this issue, is that McConnell made a misrepresentation to Ballard that she needed more time to evaluate the claim, when in fact she needed time to obtain authority from her supervisors to pay the claim. Although McConnell admitted at trial that she needed more time to gain authority, not to investigate, we cannot say that this was part of a pattern of knowing conduct or that this conduct resulted in damages to Ballard. It merely delayed payment of the first claim by less than three weeks.

In examining the finding that FIE breached its duty of good faith and fair dealing, we focused on whether FIE acted reasonably in handling Ballard's claims. *See Giles,* 950 S.W.2d at 56; *Lyons,* 866 S.W.2d at 601. The test for finding knowing conduct, enunciated in *St. Paul Surplus,* is much more stringent: we must find some evidence in the record that someone with FIE must have had a subjective awareness of the falsity, deception, or unfairness. *See Connell Chevrolet Co. v. Leak,* 967 S.W.2d 888, 893 (Tex.App.-

Austin 1998, no pet.). None of the evidence to which Ballard points demonstrates such a subjective awareness. Because the record contains no evidence that FIE engaged in knowingly false, deceptive, or unfair conduct, we sustain FIE's seventh issue challenging the legal sufficiency of this finding. *See Croucher*, 660 S.W.2d at 58. Accordingly, we reverse the jury's finding and render judgment on this issue in favor of FIE.

The jury awarded punitive damages and mental anguish damages based on conduct committed "knowingly or fraudulently." Under the insurance code, a party may recover punitive damages and mental anguish damages only if the jury finds that the violation was committed knowingly. Tex. Ins.Code Ann. art. 21.21, § 16(b)(1) (West Supp.2003) (concerning punitive damages); *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 435–36 (Tex. 1995) (concerning mental anguish damages). The DTPA also requires a knowing finding to recover these damages. Tex. Bus. & Com.Code Ann. § 17.50(b)(1) (West 2002); *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex.2002); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 41.003(c) (West 1997):

> If the claimant relies on a statute establishing a cause of action and authorizing exemplary damages in specified circumstances or in conjunction with a specified culpable mental state, exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the damages resulted from the specified circumstances or culpable mental state.

Having found no evidence of a knowing violation, we must reverse the jury's awards of punitive damages and mental anguish damages. We therefore need not address FIE's eighth and ninth issues that the evidence is legally and factually insufficient to support these findings. We render judgment that Ballard take nothing on her claims for punitive damages and mental anguish.

### No–Evidence Motion for Summary Judgment on Concurrent Causation

FIE argues in its sixth issue that the district court erred in granting Ballard's no-evidence motion for summary judgment on concurrent causation. We will apply the general standards for reviewing a grant of a no-evidence motion for summary judgment. *See, e.g., Holmstrom*, 26 S.W.3d at 530. Because the district court's order does not specify the ground or grounds relied on for its ruling, we will affirm the summary judgment if any of the theories Ballard advanced are meritorious. *See Carr*, 776 S.W.2d at 569.

FIE asserted in its second amended answer that Ballard had the burden of segregating damages among covered and non-covered losses, under the doctrine of concurrent causation. Under this doctrine, when covered and non-covered perils combine to create a loss, the insured is entitled to recover only that portion of the damage caused solely by the covered peril. *Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 162 (Tex.1971); *Wallis v. United Servs. Auto. Ass'n*, 2 S.W.3d 300, 302–03 (Tex.App.-San Antonio 1999, pet. denied). The doctrine of concurrent causation is not an affirmative defense or an avoidance issue; rather, it is a rule embodying the basic principle that insureds are not entitled to recover under their insurance policies unless they prove that their damage is covered by the policy. *Wallis*, 2 S.W.3d at 303. Thus, an insured may only recover for the amount of damage caused solely by the covered peril. *Id.* The burden is on the insured to prove coverage. *Id.* The insured must therefore present some evidence upon which the

jury can allocate the damages attributable to the covered peril. *Id.* Because allocation is central to the claim for coverage, an insured's failure to carry the burden of proof on allocation is fatal to the claim. *Id.* The insured must attempt to segregate the loss caused by the covered peril from the loss caused by the excluded peril. *Id.*

The doctrine of concurrent causation is inapplicable in this case for two reasons. First, FIE never denied any claim at issue in this appeal on the ground that the claim was a non-covered peril. Second, FIE asserted the doctrine of concurrent causation pursuant to article 21.58(b) of the insurance code, which states that "[i]n any suit to recover under a contract of insurance, the insurer has the burden of proof as to any avoidance or affirmative defense that must be affirmatively pleaded under the Texas Rules of Civil Procedure." Tex. Ins.Code Ann. art. 21.58(b) (West Supp. 2003). All of Ballard's claims presented to the jury were extra-contractual, beyond recovery under the contract of insurance. Therefore, we overrule FIE's sixth point of error and affirm the district court's ruling granting Ballard's no-evidence summary judgment on concurrent causation.

### District Court's Evidentiary Rulings

■ FIE contends in its fifth issue that the district court abused its discretion and deprived FIE of a fair trial by excluding evidence of settlement offers made during mediation, some instances of Ballard's conduct toward FIE's adjusters, and de la Mora's testimony that Ballard's lawyers delayed the appraisal process. FIE further argues that the district court abused its discretion by allowing evidence about the possible health effects of mycotoxins from molds. We apply an abuse of discretion standard to the question of whether a district court erred in an evidentiary ruling. *National Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527–28

(Tex.2000); *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). We may reverse a district court under this standard only when we find that "the court acted in an unreasonable or arbitrary manner," *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991), or "without regard for any guiding rules or principles." *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998) (quoting *Alvarado,* 897 S.W.2d at 754).

When seeking to reverse a judgment based on an improper evidentiary ruling, a complaining party "need not prove that but for the error a different judgment would necessarily have been rendered, but only that the error probably resulted in an improper judgment." *Alvarado,* 897 S.W.2d at 753; *accord Malone,* 972 S.W.2d at 43. To prevail, the party must demonstrate that "the judgment turns on the particular evidence excluded or admitted." *Alvarado,* 897 S.W.2d at 753–54. We review the entire record to determine whether a party has met this burden. *Id.* at 754. If any legitimate basis exists to support a district court's evidentiary ruling, then we must uphold the court's decision. *Malone,* 972 S.W.2d at 43; *State Bar v. Evans,* 774 S.W.2d 656, 658 n. 5 (Tex.1989) (citing *McCormick on Evidence* § 52, at 131 (3d ed.1984)).

FIE argues that its offer of $734,000 at mediation and Ballard's demand of no less than $10 million plus media rights should be admissible to show that FIE attempted to settle in good faith and to counter the implication that FIE could have settled in May 1999. Discussions in alternative dispute resolution proceedings are generally confidential and inadmissible as evidence against a participant in any judicial proceeding. Tex. Civ. Prac. & Rem.Code Ann. § 154.073(a) (West Supp.2003). Evidence of conduct made in settlement negotiations can be admissible if offered for a

purpose other than to show liability, such as "negativing a contention of undue delay." Tex.R. Evid. 408. However, as the district court stated, a "cloak of confidentiality" surrounds mediation, and the cloak should be breached only sparingly.

FIE cites *Avary v. Bank of America, N.A.* for the proposition that it should have been able to disclose evidence of Ballard's conduct during the mediation. 72 S.W.3d 779 (Tex.App.-Dallas 2002, pet. denied). *Avary* is distinguishable: it concerned a bank's breach of fiduciary duty in rejecting a higher settlement offer during mediation. The court allowed evidence of the bank's conduct during mediation because it went to the heart of the parties' dispute. *Id.* at 796. Here, the district court excluded this evidence primarily because FIE's conduct was at issue, not Ballard's. *See* Tex. Ins. Code Ann. art. 21.21, § 4(10)(a)(ii) (conduct in question is whether *insurer* "fail[ed] to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear").

FIE's reliance on two other cases allowing evidence of settlement negotiations is also misplaced. *See U.S. Fire Ins. Co. v. Millard,* 847 S.W.2d 668 (Tex.App.-Houston [1st Dist.] 1993, orig. proceeding); *State Farm Mut. Auto. Ins. Co. v. Wilborn,* 835 S.W.2d 260 (Tex.App.-Houston [14th Dist.] 1992, orig. proceeding). In both cases, because the entire basis of the claim was the amount of the insurance company's settlement offer, it was necessary for the court to admit settlement negotiation evidence. Here, although the district court could have admitted evidence of Ballard's demands at mediation for the purpose of countering her contention that FIE unduly delayed in paying her claims, *see* Tex.R. Evid. 408, he excluded the evidence because of the danger of unfair prej-

udice and because of the general rule that settlement discussions are confidential. In light of the standard of review, we decline to breach the "cloak of confidentiality" that exists to encourage settlement discussions. *See Wilborn,* 835 S.W.2d at 261. Accordingly, we hold that the district court did not act in an unreasonable or arbitrary manner or without regard for any guiding rules or principles in excluding evidence of settlement offers made during mediation. *Beaumont Bank,* 806 S.W.2d at 226. Further, FIE has failed to show how the exclusion of this evidence led to the rendition of an improper judgment.

■■■ FIE next argues that the district court abused its discretion in excluding certain evidence of Ballard's interaction with FIE's adjusters. FIE asserts that the jury could not properly determine whether FIE acted reasonably without hearing evidence of Ballard's conduct, which FIE alleges obstructed FIE's efforts to adjust her claims, caused delay, and generally defeated FIE's attempts to settle. Evidence that FIE attempted to admit included Ballard's threats to use her $44 million trust fund to fight FIE and to snort *stachybotrys* if necessary to hurt FIE. The district court excluded the character evidence after balancing what he termed the "extremely, extremely limited probative value" of the evidence against the danger of unfair prejudice, confusion of issues, and misleading the jury. *See* Tex.R. Evid. 403, 404. Further, he specifically excluded the evidence about Ballard's wealth because courts "try to keep those kinds of tawdry considerations out of the fact-finding process."

Although other evidence of Ballard's conduct may have added coloratura to the trial, there was ample evidence before the jury showing the flavor of Ballard's conduct. For example, the jury saw dozens of letters that Ballard sent to FIE through-

out the claims-handling process. As early as mid-January 1999, Ballard complained in a letter to McConnell about "your 'experts' traipsing in and out of my house." In a March 8, 1999, letter to McConnell, Ballard wrote, "I hope you take great comfort knowing while you are out trying to manipulate the facts and throw an inadequate sum of money at me that doesn't get me to first base, my family is living in a house that clearly is dangerous." She ended her letter with, "You should be ashamed." After moving out of the house, she demanded that FIE pay for accommodations at the expensive Four Seasons Hotel in Austin as "the only thing I've found suitable." These letters and many others more than adequately conveyed the flavor of Ballard's contentious stance toward FIE, which began within weeks of her filing the December 17, 1998 claim. Additionally, the jury heard evidence that Ballard changed both lawyers and appraisers during the claims-handling and litigation process, which it could have inferred as a contribution to delays.

While the jury did not get to see the full picture of Ballard's conduct, we believe that it saw enough of the picture to evaluate whether her conduct hampered FIE's efforts. Accordingly, we hold that the district court acted within the bounds of its discretion in excluding certain evidence of Ballard's interaction with FIE's adjusters. More importantly, FIE failed to demonstrate how the exclusion of this evidence led to the rendition of an improper judgment.

FIE further asserts that the district court erred in excluding testimony by de la Mora that Ballard "obstructed and delayed" the appraisal process. FIE argues that by excluding this testimony, the "court permitted Ballard to profit from the false impression that [FIE] delayed the process." The jury heard evidence that the appraisal process began in May 1999 and did not conclude until November 2000. But it heard no evidence about why the process took so long because the judge granted Ballard's motion in limine that no mention be made of Ballard or her appraiser delaying the appraisal process. The district court's practice of allowing jurors to question witnesses at the end of their testimony resulted in the district court posing the following question to de la Mora:

THE COURT: Why did the appraisal process take 18 months?

THE WITNESS: The appraisal process took 18 months because the Ballard attorneys kept keeping us from going to the house to do the work that we needed to do.

The district court then excused the jury, reprimanded de la Mora, and warned that he would be in contempt of court if he "advocated" for FIE again. The jury returned, and the district court requested that they disregard de la Mora's answer.

For the same reasons as discussed concerning Ballard's conduct toward FIE, we conclude that the district court acted within the bounds of its discretion in excluding evidence of Ballard's conduct purportedly delaying the appraisal process and that FIE has failed to show how the exclusion of this evidence led to the rendition of an improper judgment.

In its last contention that the district court abused its discretion, FIE argues that the district court should not have allowed admission of evidence that mycotoxins from molds can cause serious personal injury. FIE urges that the district court should have excluded all evidence in this area because it granted FIE's motion to exclude Allison's causation experts, who would have testified about the health effects of exposure to the mycotoxins.

Among the few references to the health effects is that one of the mycotoxins is a known liver carcinogen and, in a letter from Ballard put into evidence by *FIE,* that one of the Ballard pets had a "terrible skin problem caused by *Stachybotrys* exposure." The district court, after careful deliberation, allowed this evidence because it was relevant to Ballard's mental anguish claim, not for her own fear of getting ill but her concern for her family.[9] The district court put a further safeguard in place by twice instructing the jury that personal injury claims were not part of the case. The general rule is that an instruction to disregard a subject not part of the case will cure error. *See, e.g., Fowler v. Garcia,* 687 S.W.2d 517, 520 (Tex.App.-San Antonio 1985, no writ). We therefore hold that the district court acted within the bounds of its discretion in allowing evidence of the health effects of mycotoxins and that FIE has failed to show how the admission of this evidence led to the rendition of an improper judgment. Having found no abuse of discretion in the district court's evidentiary rulings of which FIE complains, we overrule FIE's fifth issue.

### Attorneys' Fees

FIE contends in its tenth issue that there is insufficient evidence of reasonable and necessary attorneys' fees and thus that we should reverse the jury's award of $8.9 million in fees to Ballard's attorneys. A plaintiff who prevails in a DTPA cause of action "shall be awarded court costs and reasonable and necessary attorneys' fees." Tex. Bus. & Com.Code Ann. § 17.50(d) (West 2002). A plaintiff who prevails in a cause of action under article 21.21 of the insurance code may obtain "the amount of actual damages plus court costs and reasonable and necessary attorneys' fees." Tex. Ins.Code Ann. art. 21.21, § 16(b)(1) (West Supp.2003).

While we review the amount that the jury awarded under a legal sufficiency standard, we review the trial court's decision to grant or deny fees at all under an abuse of discretion standard. *See Bocquet v. Herring,* 972 S.W.2d 19, 22 (Tex.1998) (Baker, J., dissenting); *Hunt v. Baldwin,* 68 S.W.3d 117, 135 n. 8 (Tex.App.-Houston [14th Dist.] 2001, no pet.). One of the factors in determining the reasonableness of an award of attorneys' fees is the amount of damages awarded. *Wayland v. City of Arlington,* 711 S.W.2d 232, 233 (Tex.1986). However, this is only one among many factors to consider. *See Gill Sav. Ass'n v. International Supply Co.,* 759 S.W.2d 697, 703–04 (Tex.App.-Dallas 1988, writ denied) (detailing twelve factors normally used in determining reasonableness of award of attorneys' fees). Because we are remanding the question of attorneys' fees, we need not decide whether the district court abused its discretion.

Factors that a fact finder should consider when determining the reasonableness of a fee include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for sim-

---

**9.** FIE, relying on *Temple–Inland Forest Products Corp. v. Carter,* asserts that mental anguish for fear of disease is no longer compensable in Texas. *See* 993 S.W.2d 88, 93 (Tex. 1999). FIE interprets *Temple–Inland* too broadly. The case only addresses fear of an *asbestos-related* disease in the absence of symptoms of any disease. *Id.* at 93 ("The question ... is whether ... fear of an increased risk of developing an asbestos-related disease when no disease is presently manifest should be permitted.... We conclude that no such action should be recognized.").

ilar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex.1997) (citing Tex. Disciplinary R. Prof. Conduct 1.04, *reprinted in* Tex. Govt.Code Ann., tit. 2, subtit. G app. A (West 1998) (Tex. State Bar R. art. X, § 9)). The fact finder should consider a contingent fee agreement, but "the plaintiff cannot simply ask the jury to award a percentage of the recovery as a fee because without evidence of the factors identified in rule 1.04, the jury has no meaningful way to determine if the fees were in fact reasonable and necessary." *Id.* at 818–19. The plaintiff must ask the jury to award fees in a specific dollar amount, not as a percentage of recovery. *Id.* at 819.

Here, the jury heard evidence of the above factors from Ballard's attorneys' fees expert, Richard Cedillo. He discussed all eight factors from rule 1.04, including the quality of the attorneys on the case and the time required. He stated that a contingent fee contract of thirty-five percent on the first eight million and forty percent on any award above that amount was fair. FIE contends that the evidence is insufficient partly because Ballard's attorneys did not submit hourly time sheets. Cedillo testified, based on his experience on complex cases and review of the Ballard file, that Ballard's attorneys spent a great deal of time on her case because of the paper, motions, preparation for seventy depositions, trial preparation, and complex issues involved. He further explained that

Ballard's attorneys did not keep hourly time sheets because they were under a contingent fee contract, not an agreement based on an hourly fee. Thus, Ballard would not expect statements about their time on the case. Having heard Cedillo's testimony, the jury awarded fees in a specific dollar amount, as requested in the charge. Cedillo's coverage of the factors stated in *Arthur Andersen*, including the suggestion that the dollar amount be based on the contingent fee, are sufficient evidence to support the award of attorneys' fees. *See Vingcard A.S. v. Merrimac Hospitality Sys., Inc.*, 59 S.W.3d 847, 870 (Tex. App.-Fort Worth 2001, pet. denied) (jury award of dollar amount based on contingent fee, after hearing testimony of the rule 1.04 factors, met the *Arthur Andersen* requirements). Accordingly, we overrule FIE's tenth issue and hold that there was legally sufficient evidence of reasonable and necessary attorneys' fees.

We cannot say, however, that the award of $8.9 million is still reasonable, given that we have significantly reduced the damages awarded by the jury. We remand the determination of attorneys' fees to the district court for further proceedings consistent with this opinion.

### Article 21.55 Damages

FIE asserts in its eleventh issue that there was no basis for awarding or calculating any interest penalty under article 21.55 of the insurance code. The purpose of article 21.55 is to obtain prompt payment of claims pursuant to policies of insurance, and its provisions are to be liberally construed to promote this purpose. *See* Tex. Ins.Code Ann art. 21.55, § 8 (West Supp.2003). Article 21.55 provides that "if an insurer delays payment of a claim following its receipt of all items, statements, and forms reasonably requested and required ... for more than 60

days, the insurer shall pay damages and other items as provided for in Section 6 of this article." Tex. Ins.Code art. 21.55, § 3(f). Section six provides for eighteen percent annual interest on the amount of the delayed payment, together with reasonable attorneys' fees. *Id.* § 6.

FIE argues that there was no basis for the 21.55 penalty because Ballard did not prove or obtain jury findings that FIE violated the article. As discussed above, we have found some evidence to support the jury finding that FIE breached its duty of good faith and fair dealing in "[f]ailing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the insurer's liability has become reasonably clear." Tex. Ins. Code Ann. art. 21.21, § 4(10)(a)(ii). McConnell unequivocally testified that FIE had all of the information that it needed to pay the costs of remediation by May 17, 1999. FIE did not pay any of those costs until August 30, 1999, more than sixty days later. Therefore, FIE subjected itself to the provisions of article 21.55.

But the record demonstrates that FIE did not cause all of the delay. Ballard rejected FIE's August 30, 1999 payments of $382,738.69 on the ground that they were based on invalid bids, but then accepted checks for the same amounts on February 17, 2000. We find, therefore, that the district court erred in calculating eighteen percent interest on $382,738.69 between August 30, 1999 and February 17, 2000, because Ballard caused that delay in payment. Otherwise, we find that the evidence supports the district court's calculations of the eighteen percent penalty, based on evidence that FIE delayed full payment of Ballard's claims for more than sixty days. Accordingly, we remand the statutory penalty issue to the district court

for recalculation in accordance with this opinion.

## CONCLUSION

Because we find no error in the district court's rulings concerning Allison's claims, we affirm the rulings of the district court in granting FIE's motion to exclude his causation experts and FIE's no-evidence motion for partial summary judgment pertaining to Allison's personal injury claims. Accordingly, we affirm the district court's judgment dismissing Allison's personal injury claims.

We hold that probative evidence supports the district court's denial of FIE's motion to transfer venue to Hays County. We further conclude that the district court did not abuse its discretion in the evidentiary rulings of which FIE complains. We also find sufficient evidence to uphold the jury's findings that FIE breached its duty of good faith and fair dealing toward Ballard and that FIE committed a DTPA violation. After a thorough review of the evidence in the record, and with deference to the province of the jury, we hold that the evidence is both legally and factually insufficient to uphold the jury's verdict on several other grounds of recovery. We find insufficient evidence to support the jury's findings of unconscionability or fraud. We additionally find insufficient evidence to support the jury's findings that FIE failed to appoint a competent, independent appraiser or that the appraisal decision was a result of fraud, accident, or mistake. Because the court's charge specified that findings of either a breach of the duty of good faith and fair dealing or a DTPA violation are sufficient to uphold the jury's award of actual damages, we affirm the actual damages award in part, in the amount of $4,006,320.72, in addition to prejudgment and postjudgment interest as stated in the final judgment. We reverse

the award of $176,000 for Ballard's reasonable and necessary costs of the appraisal process.

We further conclude that there is no evidence to support the jury's finding that FIE "knowingly" breached its duty of good faith and fair dealing toward Ballard. Because a finding of a knowing violation is required to uphold punitive and mental anguish damages, we reverse the jury's awards for these damages and render judgment that Ballard take nothing for punitive and mental anguish damages. We uphold the district court's award of the article 21.55 statutory penalty in part and remand the penalty for recalculation in accordance with this opinion. We find sufficient evidence to support the award of attorneys' fees but cannot say that the amount of the award is reasonable, given our significant reduction of the jury's damages awards. Therefore, we remand the issue of attorneys' fees to the district court for further proceedings consistent with this opinion.