Reversed and Rendered and Opinion
filed April 19, 2011

 

In
The

Fourteenth
Court of Appeals



NO. 14-10-00008-CV



Markel American
Insurance Company, Appellant 

v.

Lennar
Corporation, LENNAR HOMES OF tEXAS sALES & MARKETING LTD., AND LENNAR HOMES
OF TEXAS LAND & CONSTRUCTION LTD., Appellees 



On Appeal from
the 270th District Court

Harris County, Texas

Trial Court
Cause No. 2000-30034



 

OPINION

Appellant Markel American Insurance Company appeals
the judgment entered in favor of appellees Lennar Corporation, Lennar Homes of
Texas Sales & Marketing Ltd., and Lennar Homes of Texas Land &
Construction Ltd. (collectively, Lennar) after a jury trial.  We reverse and
render.  

I. Background

This case presents an insurance coverage dispute on
appeal from a jury verdict.  The court previously considered an appeal in this
cause from competing summary judgments.  See Lennar Corp. v. Great Am. Ins.
Co., 200 S.W.3d 651 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (Lennar
I).[1] 
Lennar had a primary policy of insurance, issued by American Dynasty, with a
limit of $1 million per occurrence and a self-insured retention of $1 million. 
Lennar purchased a commercial umbrella policy from Markel with a $25 million
limit that was excess to the primary policy.  The Markel policy was in effect from
June 1, 1999, until October 19, 2000.  

Lennar purchased Village Builders from Exxon
Corporation on January 1, 1996.  Beginning in 1992 or 1993, Village Builders started
using Exterior Insulation and Finish System (EIFS), an imitation stucco siding
product on homes it built.  Because EIFS’s outer surface is intended to be a moisture
barrier for the siding, it does not have a secondary moisture barrier to
protect underlying structures.  It appears undisputed that EIFS allows the
siding to trap water behind it and the materials underneath the EIFS are
damaged by ongoing exposure to moisture.  Village Builders built approximately
800 homes in the Houston area with EIFS, of which 400 to 500 were built after
Lennar had purchased Village Builders.  

In 1994, Village Builders began to experience
warranty problems with EIFS.  Lennar was looking for a replacement barrier
product for EIFS in 1997 and decided to stop using EIFS in the first part of
1998.  

Shortly after a story appeared on a Dateline
television program in March 1999 about problems with EIFS, Lennar started
receiving phone calls from concerned homeowners inquiring about EIFS.  Thus
began the saga of Lennar’s remarkable, voluntary business plan to proact upon
its EIFS issues and remediate in the interest of customer relations.

Specifically, in 1999, Lennar began contacting
homeowners by letter to arrange an inspection of the EIFS.  In August 1999,
Lennar undertook EIFS repairs on the homes.  Lennar tried to repair sixteen
homes, but those homes still had moisture problems.  Lennar decided to pursue a
uniform course of action:  Lennar would remove all of the EIFS on a home if it
found it necessary to remove 60–75% of the EIFS in order to do the repair and replace
it with cementious stucco.  Ultimately, in the first part of 2001, Lennar
decided to strip all of the EIFS off all the houses and replace it with
conventional stucco.  It took approximately four and one-half years, from fall
1999 to 2003, to repair all the homes.  

On January 28, 2000, Lennar first put Markel on notice
that it had a potential claim regarding damage from the EIFS.  Markel responded
that it could not provide Lennar with a coverage analysis without additional
information regarding the loss.  In May 2000, Lennar sent Markel a letter
listing fifty-five homes for which it was seeking coverage.  In August 2000,
Markel sent Lennar a reservation of rights letter.  In December 2000, Lennar informed
Markel that it was treating Markel’s reservation of rights letter as a denial
of the duty to defend and indemnify.  Markel responded that its prior
correspondence was a reservation of rights, not a disclaimer.  Lennar continued
to update Markel on the number of complaints received.  

In June 2000, Lennar sued the primary carrier
American Dynasty, and in February 2001, added Markel as a defendant, requesting
a declaratory judgment that the carriers had a duty to indemnify Lennar for the
EIFS claims.  Lennar also sued Gerling America Insurance Company, RLI Insurance
Company, Insurance Company of the State of Pennsylvania, United States Fire
Insurance Company, United States Fidelity and Guaranty Company, and Westchester
Fire Insurance Company, all of which had issued policies that Lennar claimed
provided coverage.  

Lennar and all the carriers moved for summary
judgment on coverage.  Id. at 661.  The trial court denied Lennar’s
motion and granted all the insurance companies’ motions.  Id.  On appeal
in Lennar I, this court reversed the summary judgments as to Markel and
American Dynasty, affirmed the summary judgments as to the other carriers, and
affirmed the denial of Lennar’s motions for summary judgment as to all the carriers.
 Id. at 660, 704.  American Dynasty and Lennar settled prior to trial,
leaving Markel as the only defendant at trial.  

After a jury trial to determine the amount of covered
property damage, the trial court awarded Lennar $2,965,114.16 in actual
damages, $1,227,476.03 in prejudgment interest, $2,171,825.98 in attorney’s
fees for trial, $250,000 for appeal to the court of appeals, and $100,000 for
appeal to the Texas Supreme Court.  

In this appeal, Markel argues, inter alia, that
Lennar failed to apportion its covered losses from its uncovered losses, thereby
precluding recovery for covered losses, and that Lennar did not establish that
it was legally liable to the claimants as required to establish coverage.  

II. Analysis

A. Segregation
between covered & Uncovered Losses

In its first issue, Markel contends there is no
evidence that Lennar suffered a loss covered by the policy because Lennar failed
to apportion or distinguish covered losses from uncovered losses.  In reviewing
the legal sufficiency of the evidence, we view the evidence in the light
favorable to the verdict, crediting favorable evidence if reasonable persons
could, and disregarding contrary evidence unless reasonable persons could not.  City
of Keller v. Wilson, 168 S.W.3d 802, 807 (Tex. 2005).  We may not sustain a
legal sufficiency, or “no evidence” point unless the record demonstrates: (1) a
complete absence of a vital fact; (2) the court is barred by the rules of law
or of evidence from giving weight to the only evidence offered to prove a vital
fact; (3) the evidence to prove a vital fact is no more than a scintilla; or
(4) the evidence established conclusively the opposite of the vital fact.  Id.
at 810.  

An insured is not entitled to recover under an
insurance policy unless it proves its damages are covered by the policy.  Employers
Cas. Co. v. Block, 744 S.W.2d 940, 944 (Tex. 1988), overruled in part on
other grounds by State Farm Fire & Cas. Co. v. Gandy, 925 S.W.2d 696
(Tex. 1996).  Under the doctrine of concurrent causes, when covered and
non-covered perils combine to create a loss, the insured is entitled to recover
only that portion of the damage caused solely by the covered peril.  Comsys
Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co., 130 S.W.3d 181, 198
(Tex. App.—Houston [14th Dist.] 2003, pet. denied); Wallis v. United Servs.
Auto. Ass’n, 2 S.W.3d 300, 303 (Tex. App.—San Antonio 1999, pet. denied). 
The doctrine of concurrent causation is not an affirmative defense or an
avoidance issue; rather, it is a rule embodying the basic principle that
insureds are not entitled to recover under their insurance policies unless they
prove their damage is covered by the policy.  All Saints Catholic Church v.
United Nat’l Ins. Co., 257 S.W.3d 800, 802 (Tex. App.—Dallas 2008, no pet.);
Comsys Info. Tech. Servs., Inc., 130 S.W.3d at 198.  The burden is on
the insured to prove coverage.  All Saints Catholic Church., 257 S.W.3d at
802.  The insured must present some evidence from which the jury can allocate
the damage attributable to the covered peril.  Lyons v. Millers Cas. Ins.
Co. of Tex., 866 S.W.2d 597, 601 (Tex. 1993); Travelers Indem. Co. v.
McKillip, 469 S.W.2d 160, 163 (Tex. 1971); Comsys Info. Tech. Servs.,
Inc., 130 S.W.3d at 198; Wallis, 2 S.W.3d at 303.  The insured must
attempt to segregate the loss caused by the covered peril from the loss caused
by the uncovered peril and secure a jury finding on the amount of damage
attributable to the different causes.  McKillip, 469 S.W.2d at 162; Wallis,
2 S.W.3d at 303.  The failure to segregate covered and uncovered perils is
fatal to recovery.  Comsys Info. Tech. Servs., Inc., 130 S.W.3d at 198; Allison
v. Fire Ins. Exchange, 98 S.W.3d 227, 258 (Tex. App.—Austin 2002, pet. granted,
judgm’t vacated w.r.m.).  

Lennar contends that Markel waived its argument that
Lennar failed to segregate its covered losses from its uncovered losses by not
requesting an instruction on the apportionment of covered and uncovered
losses.  However, Markel is not complaining of charge error on appeal. 
Instead, Markel is challenging the legal sufficiency of the evidence supporting
the jury’s answer to Question No. 1.  Markel presented its objection that
Lennar had not segregated its covered losses from its uncovered losses in its
motion for instructed verdict, objections to the jury charge, and motion
notwithstanding the verdict.  See Cecil v. Smith, 804 S.W.2d 509, 510–11
(Tex. 1991) (setting forth methods for preserving error on no-evidence
challenge).  

To preserve a complaint for review on appeal, a party
must present to the trial court a timely request, objection, or motion that
states the specific grounds for the ruling requested.  Tex. R. App. P. 33.1(a)(1).  The complaining party must also
show that the trial court ruled on the request, objection, or motion “either
expressly or impliedly.”  Tex. R. App.
33.1(a)(2)(A).  The trial court expressly denied Markel’s motion for instructed
verdict and overruled its objections to the court’s charge and impliedly
overruled its motion notwithstanding the verdict by entering a final judgment
in favor of Lennar.  See Chilkewitz v. Hyson, 22 S.W.3d 825, 828 (Tex.
1999); Mangum v. Turner, 255 S.W.3d 223, 225 (Tex. App.—Waco 2008, pet.
denied).  Therefore, we conclude that Markel preserved its no-evidence challenge.
 

            Lennar further
contends that, because Markel did not object to the charge, the legal sufficiency
standard should be measured against the charge actually submitted rather than
against definitions of property damage not found in the charge.  See Akin,
Gump, Strauss, Hauer & Feld v. Nat’l Dev. & Research Corp., 299
S.W.3d 106, 112 (Tex. 2009) (“Because there was no objection to the charge as
submitted, we assume, without deciding, that the instruction was correct and
measure the evidence by the charge as given.”).  However, as explained above,
Markel objected to the submission of Question No. 1 on the basis that Lennar
had not allocated the covered losses from the uncovered losses.[2]  Therefore,
we measure the legal sufficiency of the evidence against the definition of
covered property damage set forth in Lennar I.  See St. Joseph Hosp.
v. Wolff, 94 S.W.3d 513, 530 (Tex. 2002) (stating that, because the trial
court submitted an erroneous definition over a proper objection, the court
would measured the legal sufficiency of the evidence supporting the jury’s
finding by the correct definition).

            Markel argues there
is no evidence of covered property damage because Lennar did not segregate the
costs related to the removal and replacement of EIFS as a preventative measure
from costs related to the removal and replacement of EIFS where there was
property damage.  Question No. 1 asked the jury to determine, for each listed
home, the “total amount that Village Builders incurred in payment of property
damage” and further defined “property damage.”  Question No. 1 states, in
relevant part:

For each home on the Answer Sheet (as indicted by Job
Number) state the total amount that Village Builders incurred in payment of
property damage, if any, to the home.

Answer in dollars and cents, if any.

Payment of “property damage” includes only the following:

·       
The cost to remove and replace the EIFS in order to access and
repair underlying water damage or in order to determine the areas of underlying
water damage.

·       
The cost to repair any water damage to the home.

·       
The cost to repair broken windows, cracked driveways, landscaping,
and other parts of the home that were damaged in the course of repairing water
damage to the home.

In Lennar I, we rejected Lennar’s argument
that all costs to fully remove and replace EIFS are covered property damage.  See
200 S.W.3d at 679 (“Even if all the homes experienced water damage, we cannot
conclude Lennar’s costs to remove and replace all EIFS on the homes are
‘damages because of . . . property damage.’”).  Instead, we held that costs to
repair water damage to the homes and costs to remove EIFS solely to repair
underlying water damage are covered property damage, while costs to remove and
replace EIFS as a preventative measure are not covered property damage.  Id.
at 678 n.3, 679.  Thus, we specifically instructed that Lennar must apportion
the EIFS-related damages—even on a damaged home—between its costs to remove and
replace EIFS as a preventative measure and its costs to repair water damage to
the homes.  Id. at 679–80 & n.36.  

In Question No. 1 the jury was asked to state the
total amount Village Builders paid for property damage to each house.  Lennar
introduced into evidence Plaintiffs’ Exhibit No. 1A—a spreadsheet summarizing
the repair costs for each house.  The “remedial cost” line item is, according
to Daris Horn, Lennar’s Regional Customer Care Manager, the “total cost to
remove the EIFS, to find the damages, to repair all damages, and to reinstall
the hard-coat stucco system.”  However, Horn also testified that “there’s
absolutely no way” that Lennar could find all EIFS damage without removing all
the EIFS.  So, through Exhibit No. 1A, Lennar asked the jury to award all costs
to remove EIFS on any house that sustained damage.  As such, Lennar offered no
evidence of costs to remove EIFS solely on the damaged portion of each home.  

In this appeal, Lennar explains that it self-apportioned;
that is, Lennar omitted from its proof at trial every home that had not
incurred covered property damage.  Lennar removed forty-four homes from its
proof prior to trial and four more homes during trial.  Lennar asserts that it “allocated
out” a number of homes, thereby satisfying its burden to apportion between
covered and uncovered losses.  Lennar contends the court’s charge properly
instructed the jury that the costs of removing EIFS to access and repair
underlying water damage or determine the areas of underlying damage are covered
property damage expenses.  We disagree.  

The jury charge defined “property damage,” in part,
as “[t]he cost to remove and replace the EIFS in order to access and repair
underlying water damage or in order to determine the areas of underlying
water damage.”[3] 
The removal and replacement of EIFS “in order to determine the areas of
underlying water damage” as defined in the charge includes merely removing and
replacing EIFS as a preventative measure, whether there was property damage or
not.  Thus, this definition of “property damage” does not limit the removal and
replacement of EIFS “in order to determine the areas of underlying water
damages” to areas in which property or water damage was actually found.  Instead,
this definition improperly included the costs of the removal and replacement of
EIFS for preventative measures, though we expressly held in Lennar I that
such costs were not covered property damage.  See id. at 677, 679.  

Moreover, we specifically directed Lennar to
“apportion the EIFS-related damages between its costs to remove and replace
EIFS as a preventative and its costs to repair water damage to the homes.”  Id.
at 679–80.  This Lennar did not do.  Lennar admits it did not present evidence
from which the jury could allocate between costs to remove EIFS to uncover
damage or as a preventative measure.  See McKillip, 469 S.W.2d at 162
(“[T]he insureds were obligated to introduce evidence to prove and secure jury
findings that the damage was caused solely by the windstorm, an insured peril;
or segregating the damage caused by the insured peril from that caused by the snowstorm,
an excluded peril.”).  Lennar’s failure to do so is fatal to its recovery for
covered losses.  See Comsys Info. Tech. Servs., Inc., 130 S.W.3d at 198;
Allison, 98 S.W.3d at 258.  Because Lennar did not sustain its burden to
segregate, there is no evidence of its covered-loss damages.  See Paulson v.
Fire Ins. Exch., 393 S.W.2d 316, 319 (Tex. 1965) (reforming court of
appeals judgment to provide take-nothing judgment for insured because insured
did not produce evidence which would afford reasonable basis for estimating
amount of damage caused by risk covered by policy); Wallis, 2 S.W.3d at
304 (affirming the judgment notwithstanding verdict because the evidence was
not legally sufficient to support the jury’s finding on the amount of damages
caused solely by the covered peril); U.S. Fire Ins. Co. v. Matchoolian,
583 S.W.2d 692, 694 (Tex. Civ. App.—Houston [14th Dist.] 1979, writ ref’d
n.r.e.) (reversing and rendering a take-nothing judgment where the insured did
not attempt to segregate damage caused by the covered peril from the uncovered
peril); State Farm Lloyds v. Kaip, No. 05-99-01363-CV, 2001 WL 670497,
at *3 (Tex. App.—Dallas June 15, 2001, pet. denied) (op. on reh’g, not
designated for publication) (reversing and rendering a take-nothing judgment
where the insured did not secure a jury finding on the amount of damages
attributable to the covered peril because she did not attempt to segregate the
damage caused by the covered perils from the uncovered perils, and the jury was
never given the opportunity to consider whether the excluded perils caused a
portion of the loss).[4] 


Accordingly, we sustain Markel’s first issue.[5]

B. “Ultimate
Net Loss”

In its second issue, Markel asserts as an independent
ground for reversal that there is no evidence that Lennar was “legally
obligated” to pay the claimants or that there was an adjudication, arbitration,
or settlement to which Markel agreed.  Under the policy, the parties agreed
that: 

[Markel] will pay on behalf of [Lennar] for that portion of
‘ultimate net loss’ in excess of the ‘retained limit’ because of . . .
‘property damage to which this insurance applies . . .  

The policy defines “ultimate
net loss” as follows: 

“Ultimate net loss” means the total amount of damages for
which the insured is legally liable in payment of . . . “property
damage,” . . . “Ultimate net loss” may be established by adjudication,
arbitration, or a compromise settlement to which we have previously agreed in
writing. . . .[6]


The parties agree
that Lennar did not become legally liable by way of arbitration.  However,
Lennar argues that legal liability is established both by adjudication and by
compromise settlement.[7] 


1. Adjudication

i. Residential Construction Liability Act

At trial, Lennar claimed that it established its “ultimate
net loss” or that it was “legally liable” for the repair costs under the
Residential Construction Liability Act (RCLA).  See Tex. Prop. Code Ann. § 27.004 (West Supp.
2009).[8]
 Lennar submitted two jury questions, over Markel’s objection, to show that it
was legally liable to pay the homeowners’ claims.  Question No. 6 of the charge
asked whether the construction defect created an imminent threat to the health
and safety of the inhabitants of the homes.  Question No. 7 asked whether
Village Builders took reasonable steps to cure the construction defect as soon
as practicable and within a reasonable time.  The jury answered each question
in the affirmative.  Markel moved for the trial court to disregard the jury’s
answers.  

Markel argues that the jury’s answers to Question
Nos. 6 and 7 should have been disregarded because there is no evidence to
support its answers and the RCLA issue is immaterial.  A trial court may
disregard a jury finding only if there is no evidence to support the finding or
if the issue is immaterial.  Spencer v. Eagle Star Ins. Co. of Am., 876 S.W.2d
154, 157 (Tex. 1994); Hall v. Hubco, Inc., 292 S.W.3d 22, 27 (Tex. App.—Houston
[14th Dist.] 2006, pet. denied).  A question is immaterial when it should not
have been submitted or was properly submitted but has been rendered immaterial
by other findings.  Spencer, 876 S.W.2d at 157; Hall, 292 S.W.3d at
27.[9]  

Markel contends the jury’s affirmative answers to
Question Nos. 6 and 7 do not prove that Lennar was legally liable to pay under
the RCLA because the statute does not create a cause of action.  See Tex. Prop. Code Ann. § 27.005 (West 2000)
(“This chapter does not create a cause of action or derivative liability or
extend a limitations period.”); see also Gentry v. Squires Constr., Inc.,
188 S.W.3d 396, 404 (Tex. App.—Dallas 2006, no pet.); Branton v. Wood,
100 S.W.3d 645, 646 n.1 (Tex. App.—Corpus Christi 2003, no pet.); Sanders v.
Constr. Equity, Inc., 42 S.W.3d 364, 370 (Tex. App.—Beaumont 2001, pet.
denied).  Instead, the RCLA modifies causes of action for damages resulting
from defects in residences by limiting and controlling causes of action that
otherwise exist.  Gentry, 188 S.W.3d at 404; Branton, 100 S.W.3d
at 646 n.1; Sanders, 42 S.W.3d at 370.  

Lennar admits the RCLA does not create an independent
cause of action, but argues that it creates obligations imposed by law.  Even
if the RCLA could apply to any causes of action against Lennar, these findings
do not establish that Lennar was legally liable to pay any claims.  There was
no adjudication of any claims to which the RCLA could apply because Lennar had settled
whatever potential claims the homeowners may have had.  Hypothetical claims do
not establish that Lennar is legally liable to pay under the policy.  Because there
is no evidence that Lennar was legally obligated to pay under the RCLA, the
trial court should have disregarded the jury’s answers to Question Nos. 6 and
7.  See Gen. Star Nat’l Ins. Co. v. Universal Fabricators, Inc., 585
F.3d 662, 673 (2d Cir. 2009) (holding that the insured’s “legal liability” was
not established by adjudication under identical policy language where the
insured was not a party to the underlying lawsuit and no judgment was entered
against the insured, and consequently “ultimate net loss” also could not be
established). 

ii. Defective Product

Lennar further claims in this appeal that it was
“legally liable” for using a defective product—EIFS.  Lennar asserts that it is
legally liable for harm proximately caused by the use of EIFS in the
construction of the homes if there was a safer alternative design and the
defect was a producing cause of property damage for which the homeowner sought
recovery.  See Tex. Civ. Prac.
& Rem. Code Ann. § 82.005(a) (West 2011).  Lennar states that
Question No. 1 did not include the “legally liable” component, i.e., that
Lennar used a defective product, but it did ask the basic coverage issue. 
Lennar asserts that, because Markel did not object to the omission of this
“legally liable” component or request submission of an appropriate definition,
a finding that Lennar is legally liable for using a defective product is deemed
found by the trial court in support of the judgment if there is factually
sufficient evidence to support it.  See Tex. R. Civ. P. 279.  

Even if there were a deemed finding on liability for
use of EIFS, there was no defective product claim against Lennar because the
homeowners were not part of this lawsuit; Lennar had already settled any
potential claims the homeowners might have had against it.  As Markel points
out, Lennar was not trying to prove a product defect claim against itself.  In
the absence of adjudication on any claim for the use of a defective product, there
is no evidence of legal liability or “ultimate net loss.”  

2. Settlement Agreements

Lennar also argues that the settlement agreements
with the homeowners establish its legal liability by imposing a contractual
obligation to repair water damage to the homes as a result of the use of the
EIFS.  It is undisputed that Lennar entered into a settlement agreement with
each homeowner.  The contract provides that Markel will pay on behalf of Lennar
that portion of the “ultimate net loss” of the retained limit because of
property damage to which the policy applied.  Under the policy, one way to
establish “ultimate net loss” is by “a compromise settlement to which [Markel
has] previously agreed in writing.”  Markel argues that the settlement
agreements do not establish “ultimate net loss” because Markel did not agree to
the homeowner settlement agreements in writing.  It is, in fact, undisputed
that Markel did not consent in writing to Lennar’s settlement of the
homeowners’ claims.  

Lennar contends that Markel’s lack of consent is
immaterial because Markel did not show that it was prejudiced by Lennar’s
settlement of the homeowner’s claims without Markel’s consent.  Question No. 9
asked, “Was Markel prejudiced by Village Builder’s failure to obtain Markel’s
consent: (a) to enter into any compromise settlement agreement, or (b) to
voluntarily make any payment, assume any obligation, or incur any expense?” 
The jury found that Markel was not prejudiced by the settlements without
consent.  As explained below, Markel was not required to establish prejudice in
order to rely upon the “compromise settlement” provision of ultimate net loss.

Condition E of the policy also contains a
settlement-without-consent provision, which states, in relevant part, that it
is a requirement that “no insured, except at their own cost, voluntarily make
any payment, assume any obligation, or incur any expense, other than for
incidental first aid, without our consent.”  Lennar was required under
Condition E to obtain Markel’s consent before settling the homeowners’ claims. 
In Lennar I, we held that an insurer cannot rely on a
settlement-without-consent condition to avoid coverage unless the
insurer suffers prejudice; we further held that Markel had presented no summary
judgment evidence that it was prejudiced by Lennar’s violation of Condition E. 
Lennar I, 200 S.W.3d at 695.  

However, Markel is not complaining in this issue
about Lennar’s failure to comply with Condition E, an issue we addressed in Lennar
I.  Instead, Markel is complaining about Lennar’s failure to obtain
Markel’s written consent prior to settling the homeowners’ claims under
“ultimate net loss.”  A compromise settlement to which Markel agreed in writing
is one of the ways to establish “ultimate net loss.”  This is the definition of
coverage under the policy.  It is not merely a condition.  Therefore, Markel
was not required to establish that it was prejudiced by Lennar’s settling the
homeowners’ claims without Markel’s written consent.[10]  

Lennar contends the prejudice requirement applies no
matter where the settlement-without-consent language is found in the policy. 
Otherwise, according to Lennar, an insurer could avoid liability by
strategically placing its settlement-without-consent language not only in the
policy “conditions,” but in other parts of the policy such as the definition of
“ultimate net loss.”  

When analyzing an insurance contract, we are guided
by the well-established principles of contract construction.  Mid-Continent
Cas. Co. v. Global Enercom Mgmt., Inc., 323 S.W.3d 151, 154 (Tex. 2010). 
Our primary goal is to determine the parties’ intent through the policy’s
written language.  Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.,
297 S.W.3d 248, 252 (Tex. 2009).  We must read all parts of the contract
together, giving effect to each word, clause, and sentence, and avoid making
any provision within the policy inoperative.  State Farm Lloyds v. Page,
315 S.W.3d 525, 527 (Tex. 2010).  We give policy language its plain, ordinary
meaning unless something else in the policy shows the parties intended a
different, technical meaning.  Tanner v. Nationwide Mut. Fire Ins. Co.,
289 S.W.3d 828, 831 (Tex. 2009).  Our analysis is confined within the four
corners of the policy itself.  Page, 315 S.W.3d at 527.  A plain reading
of the policy shows that the parties intended to define the scope of the policy’s
coverage by requiring Lennar to obtain Markel’s written consent before settling
any claims.  In construing a policy, we may not rewrite the policy or add to
its language.  Am. Mfrs. Ins. Co. v. Schaefer, 124 S.W.3d 154, 162 (Tex.
2003).  

Lennar further contends Markel waived strict
compliance with the settlement-without-consent condition.  This argument is
similarly unavailing because this requirement is a part of the definition of
coverage.  Waiver may operate to avoid forfeiture of policy and may prevent an
insurance company from avoiding payment because of the failure on the part of
the insured to comply with some requirement.  Minn. Mut. Life Ins. Co. v.
Morse, 487 S.W.2d 317, 320 (Tex. 1972).  However, waiver cannot be used to
rewrite an insurance policy and create coverage where none exists.  Ulico
Cas. Co. v. Allied Pilots Ass’n, 262 S.W.3d 773, 779, 780 (Tex. 2008); Tex.
Farmers Ins. Co. v. McGuire, 744 S.W.2d 601, 602–03 (Tex. 1988); Morse,
487 S.W.2d at 320.  Because Markel did not agree to the settlement agreements, Lennar
cannot establish “ultimate net loss.”  

Accordingly, we sustain Markel’s second issue.  

III. Conclusion

Accordingly, having sustained Markel’s first two
issues, we reverse the trial court’s judgment and render judgment that Lennar
take nothing on its claims against Markel.[11] 


 

                                                                                    

                                                                        /s/        Sharon
McCally

                                                                                    Justice

 

 

Panel consists of Justices Anderson,
Seymore, and McCally.









[1]
West incorrectly indicates that Gilbert Texas Construction, L.P. v.
Underwriters at Lloyd’s London, 327 S.W.3d 118 (Tex. 2010), abrogated Lennar
I.  





[2]
Specifically, Markel objected to Question No. 1, in relevant part: “[U]nder the
policy property damage does not include removing EIFS to determine areas of
underlying water damage as the question says at the first bullet point, and
thus we object to the question as being improper form.”





[3]
Emphasis added.  





[4]
Relying on Section 554.002 of the Texas Insurance Code, Lennar also asserts
that Markel had the burden in this case to prove an exclusion or other
avoidance of coverage.  See Tex.
Ins. Code Ann. § 554.002 (West 2009) (providing that the insurer
has the burden of proof as to any avoidance or affirmative defense).  In Wallis,
the San Antonio Court of Appeals rejected this same argument concerning section
554.002’s predecessor because the doctrine of concurrent causation is not an
affirmative defense or an avoidance issue.  See 2 S.W.3d at 303. 
Instead, it is a rule embodying the basic principle that the insured is
entitled to recover only that which is covered under its policy, i.e., that for
which it paid premiums.  Id. at 303.  Therefore, section 554.02 is
inapplicable here.  Under well-settled Texas law, the insured bears the burden
of segregating its covered losses from its uncovered losses.  See All Saints
Catholic Church, 257 S.W.3d at 804; Comsys Info. Tech. Servs, Inc.,
130 S.W.3d at 198; Wallis, 2 S.W.3d at 303.  Therefore, Lennar had the
burden to segregate its covered losses from its uncovered losses.  





[5]
Because of our disposition on this ground, we need not address Markel’s
additional segregation arguments. 





[6]
Emphasis added.  





[7]
Lennar does not assert that it has established legal liability by any other
method.





[8]
Lennar relies on Section 27.004(m) of the RCLA in support of its position that
it is legally liable to pay.  Section 27.004(m) provides that a homebuilder,
who receives written notice of a construction defect creating an imminent
threat to the health or safety of the inhabitants of the residence, “shall take
reasonable steps to cure the defect as soon as practicable.”  Tex. Prop. Code Ann. § 27.004(m).  If
the homebuilder “fails to cure the defect in a reasonable time, the owner of
the residence may have the defect cured and may recover from the contractor the
reasonable cost of the repairs plus attorney’s fees and costs in addition to
any other damages recoverable under any law not inconsistent with the
provisions of this chapter.”  Id.  





[9] 
Lennar argues that Markel waived error on appeal.  Markel preserved its
no-evidence challenge in its objections to the jury charge, which the trial
court expressly overruled, motion for directed verdict, which the trial court
expressly denied, and motion to disregard, which trial court impliedly
overruled when it entered judgment in favor of Lennar.  See Tex. R. App. P. 33.1(a)(2)(A) (providing
that error is preserved when the trial court ruled on the motion either
expressly or implicitly); Chilkewitz, 22 S.W.3d at 828 (holding that the
trial court impliedly overruled a motion for judgment notwithstanding the
verdict by rendering judgment); Hong Kong Dev., Inc. v. Nguyen, 229
S.W.3d 415, 448 n.26 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (construing
the appellants’ objection to the proposed judgment and own motion for the entry
judgment as motions for JNOV or to disregard jury findings and holding that
error was preserved by the trial court’s implicit overruling of their
objections and motion).  





[10]
In its third issue, Markel contends Lennar’s violation of the
settlement-without-consent provision found in Condition E resulted in prejudice
to Markel.  Given our disposition, we need not address this issue.  





[11]
Because of our disposition, we need not address the other issues Markel raised
in this appeal.